People of the State of Illinois, Plaintiff-Appellee, v.
Jesse Zepeda (Impleaded), Defendant-Appellant.

**Gen. No. 52,720.**

First District, Second Division.

November 4, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Saul H. Brauner, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Thomas M. Walsh, Assistant State's Attorneys, of counsel), for appellee.

■■■■■■■■■

MR. JUSTICE McCORMICK delivered the opinion of the court.

Jesse Zepeda, defendant, was indicted for the crime of murder. On June 20, 1967, at a bench trial and plea of not guilty, the court found the defendant guilty of murder as charged and sentenced him to be committed to the Illinois Youth Commission. This appeal raises the question of the propriety of the trial court's ruling admitting into evidence over objection a confession of the defendant.

At the time of the alleged offense the defendant was a minor, sixteen years old. He made a pretrial motion to suppress a confession, but the trial court overruled the motion.

The defendant's main contention is that he did not receive adequate warning concerning his constitutional rights and that when he did make a statement to the police, and later to the State's Attorney's Office, he had not knowingly waived any of his rights. He argues that anything said by him to the police or the State's Attorney should have been suppressed, and that the trial court therefore committed reversible error by admitting such statements into evidence.

The facts are that a certain Gabriel Moreno was found dead, his body having been placed under a porch. It was stipulated that if Dr. Kearns of the Coroner's Office were called upon to testify he would state that he examined the body of Gabriel Moreno on March 7, 1967, and that it was his opinion that the death was caused by hemorrhage resulting from multiple stab wounds of the face and neck; that the lethal weapon appeared to have been a broken bottle.

Jesse Zepeda and his codefendant, Larry Zavala, were arrested on March 9, 1967, and taken to Area 2 police station on Cottage Grove Avenue where they were placed in separate rooms. No juvenile officer was called until after statements had been given and the boys were being taken to the State's Attorney's Office at about 3:30 p. m.

248

The arresting officer testified that it was standard procedure to call a juvenile officer immediately after such an arrest, but he admitted that the procedure was not followed in the instant case and that no juvenile officer was present at any of the interrogations of the boys.

Two statements given by the defendant—one to the police and one to the State's Attorney—were substantially the same, and both statements placed the blame for the actual killing on Zavala, although the defendant admitted dragging the deceased across an alley after he had been beaten and before he was stabbed. The defendant also admitted standing by and watching Zavala kill the victim with a broken bottle, although a statement taken from Zavala claimed that the defendant had killed Moreno. A severance had been granted so that Zavala's statement was not introduced at defendant's trial.

The defendant maintains that his statement to the police officers was obtained illegally and that any subsequent statement was also tainted with illegality. The defense has concluded that the defendant's statements should have been suppressed and that the trial court committed reversible error in admitting those statements into evidence.

At the pretrial hearing on the motion to suppress, William Boreczky, the arresting officer, testified for the State concerning both defendant and Zavala. Before the hearing an agreement had been reached between the State and the parties-defendant that the motion would be joint, with the understanding that if it were denied there would be a severance in the trial of the defendants. The officer said that when he took the written statement from the defendant he warned him of his constitutional rights, and that he heard the Assistant State's Attorney give the required warning to the two boys at the time the second statement was taken. The documents containing questions and answers were signed by the defendant after he was asked to verify them.

■■■■■■

The following was included in the statement given to the police officer:

> Det. Boreczky: "Do you realize that you have the right to remain silent, if you choose not to remain silent anything you say or write can and will be used as evidence against you in court: you have a right to consult a lawyer before any questioning, and you have a right to have the lawyer present with you during any questioning; you not only have a right to consult with a lawyer before any questioning, but, if you lack the financial ability to retain a lawyer, a lawyer will be appointed to represent you before any questioning, and you may have the appointed lawyer present with you during any questioning. Do you fully understand what I have stated to you?"
>
> Zepeda: "Yes."
>
> Boreczky: "Do you still wish to give us this statement?"
>
> Zepeda: "Yes."
>
> Boreczky: "Can you read and write the English language, and how far did you progress in school?"
>
> Zepeda: "Yes, I can, and I went to Bowen High School and dropped out in my second year."

The following was included in the later statement given to the State's Attorney:

> Q. "Jesse, before I ask you any questions, before you might give me any answers, I want first to caution you and warn you of certain constitutional rights. First, you have an absolute right to remain silent at this time, do you understand that? Secondly, anything that you might say now might be held against you at a later time in a court proceedings, do you understand that?"
>
> A. "Yes."
>
> Q. "Thirdly, under the Constitution of the United States you have an absolute right to consult with an

attorney and have an attorney present before you might make any statement or make answers to any questions, do you understand that?"

A. "Yes."

Q. "Fourthly, if you cannot afford an attorney and you don't have the financial resources to hire one, under the law an attorney must be provided for you before you make any statement or answer any questions, do you understand that?"

A. "Yes, I do."

Q. "Knowing these things, do you now wish to waive these rights understandably and intelligently and make a statement and answer my questions?"

A. "I will make a statement."

Q. "And do you further waive these rights which I just explained to you, knowing that no promise of benefit is made to you or has been made to you, is that correct?"

A. "Yes."

Q. "And further that no threats have been made against you?"

A. "Yes."

Q. "And you now wish to waive these rights which I told you about and make a statement, is that correct?"

A. "Yes."

When the Assistant State's Attorney had completed the questioning he said, "Jesse, if you read the statement and find it to be a true and correct copy of what you have just said, will you sign the statement?" The defendant agreed and signed the statement.

Officer Boreczky testified that prior to the written warning he had explained to the defendant his constitutional rights, and that the defendant affirmed that he fully understood his rights; that he did not want to call a lawyer and that he would make a statement. The testimony disclosed that the defendant had been questioned

about half an hour before agreeing to make his first written statement.

The defendant testified on his own behalf that he had asked to speak to his mother when the police officer started questioning him. He admitted hearing a statement regarding constitutional rights, but alleged that one officer was making the statement to another and not to him; that he was not asked if he wanted a lawyer; that although he received a statement of his rights at the State's Attorney's Office, he had not understood its meaning. He said he could read and write and admitted signing his name to the statements, but that he had only been allowed to "glance" at the one given the State's Attorney before signing it.

Officer Sullivan, who had typed defendant's first statement, testified that Officer Boreczky had informed the defendant of his constitutional rights two or three times before taking his statement; and that as soon as the defendant was informed of his rights he was charged with murder.

The Assistant State's Attorney, who took statements from both boys, testified that he read each word of each statement to the boys while they followed the reading from a carbon copy; that he questioned each boy if what he read to them was exactly in accord with their answers to the questions asked. Each boy indicated the readings were accurate and each boy signed his statement.

The defendant argues that testimony from State officials that the confession was voluntary is not adequate here because "surrounding circumstances" throw doubt upon the authenticity of the voluntary character of the statements in dispute. After stating that a confession was essential in the case if a conviction were to be obtained, because the evidence was very weak, the defendant said: "The police set out in the beginning to extract a confession from the defendants without any regard to our constitutional safeguards."

252

■ We do not feel that the facts support the conclusion of the defendant. The State has presented a strong case indicating that the defendant did receive the necessary warnings and that he knowingly and intelligently waived his privileges. There was consistent testimony that the warnings were explained to the defendant several times prior to his first statement, and the written statement which the defendant signed contained the warnings. The defendant admitted that he can read and write; there is no evidence indicating that he was of subnormal intelligence, nor does defendant make any serious allegation of physical intimidation.

Ill Rev Stats 1965, c 37, § 703-2 became effective on January 1, 1966, and was applicable to this case since defendant was arrested on March 9, 1967. That section provides:

> (1) A law enforcement officer who takes a minor into custody without a warrant under Section 3–1 shall immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where he is being held; and the officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed. The minor, if not released, shall be delivered without unnecessary delay to the court or to the place designated by rule or order of court for the reception of minors.

At the time of his arrest the defendant was sixteen years old, and the above provision was applicable to him. The section requires two things of law enforcement officers who have taken a minor into custody: 1) They must "im-

253

mediately" make a "reasonable effort" to notify the legal guardian of the juvenile that he is in custody and where he is being held; and 2) They have an affirmative duty to deliver the minor to the nearest juvenile officer.

The State says that People v. Hester, 39 Ill2d 489, 508, 237 NE2d 466, disposes of this issue, and the State also says: "Nevertheless, the police here complied with that section by leaving an 'identification card' with a relative of the defendant at the time of arrest." The allegation that the police complied with the section is wholly inadequate for several reasons. First, the requirement is a "reasonable attempt to notify the parent or other person legally responsible for the minor's care. . . ." The identification card mentioned by the State was an arresting officer's card which he purportedly gave to a fourteen-year-old brother of Zavala. It would be a considerably strained interpretation of the statutory language to conclude that Officer Boreczky made a "reasonable attempt to notify" the defendant's parents by giving a police identification card to Zavala's young brother.

Further, more was required of the officer than making a reasonable attempt to notify defendant's parents, since the statute also imposed a definite duty on law enforcement officers to transfer custody of a minor "without unnecessary delay" to juvenile police officers. According to the State's own testimony, there was no attempt to immediately contact a juvenile officer; instead, the boys were taken to Area 2, Homicide, and not to a juvenile detention center. A juvenile officer was not contacted until after defendant had already given the police a signed statement.

There was dispute over whether or not defendant had asked to call his mother. He maintains that he had so requested, while the State's witnesses deny there had been any such request. Under the statutory provision, however, it would appear that the defendant

254

would not be required to make any such request; it was the duty of the police to have made a reasonable effort to contact the boys' parents or legal guardians.

The Hester case is wholly beside the point. The issue there was whether the defendant's confession was inadmissible on the ground that it had been made to a juvenile officer. Ill Rev Stats 1965, c 37, § 702–9, specifies that if a juvenile confesses to the juvenile court "or any officer thereof," such confession is inadmissible in a court other than the juvenile court. The confession in that case had been made to police officers and the Assistant State's Attorney; the question was whether under those facts such officers were juvenile officers within the intendment of the provision. That question has no relation to the one here presented; namely, whether defendant was illegally detained, and if so, whether that detention would have rendered his confession inadmissible.

 In In re Orr, 38 Ill2d 417, 231 NE2d 424, the Supreme Court considered section 703–2, c 37, Ill Rev Stats 1965. A juvenile had freely confessed to two police officers on the way to the police station, apparently relieving his mind of the burden created by his having committed the crime for which he was being investigated. His statement was admitted into evidence, and on appeal defendant urged that such admission had violated his constitutional rights and the notice provisions of the Juvenile Court Act. The court said at 425: ". . . it is apparent that this provision does not contemplate the giving of notice before the juvenile arrives at a place where he will remain for a significant period of time." Although Orr had been detained without the officers having complied with the requirements, the court found no reversible error because the boy had voluntarily confessed prior to his arriving at the place of detention. The court found that after one had already confessed voluntarily, illegal detention should not relate back to render the

confession inadmissible. It would appear that the court in Orr would have reversed the judgment had the confession been made during the time of the illegal detention instead of prior to it. In the case before us the statement was given the police during the time of the illegal detention, and consequently, was erroneously admitted.

This conclusion is substantiated when section 703–2 is read in conjunction with 702–9(1), as the latter provides in pertinent part:

> Neither the fact that a minor has been the subject of proceedings under this Act nor any confession, admission or statement *made by him to the court or to any officer thereof before his 18th birthday is admissible as evidence against him or his interests in any other court or proceeding,* . . . . [Emphasis supplied.]

Section 703–2 requires that a minor be turned over to the custody of a juvenile officer without delay. Once this has been done, any statement made by the minor to the juvenile officer would be inadmissible in any court other than those functioning under the auspices of the Juvenile Court Act. In the present case, had the police officers turned the defendant over to the custody of juvenile officers, as the statute directs, any statement he might have made to such officers could not be used as evidence against him in the criminal court under section 702–9(1). This section would be subverted if this court were to allow statements admitted into court which were given police officers in violation of section 703–2, when such statements would have been rendered inadmissible under 702–9(1) if police had complied with section 703–2.

We have already pointed out that we do not accept defendant's argument that his constitutional rights were infringed. The State has presented adequate proof that the required warnings were given and understood, then

knowingly and intelligently waived. We want to make it clear that the defendant was deprived of no constitutional rights when the statement was admitted. We conclude that the statement should have been excluded because the State's statutes call for its exclusion. The statutes here involved do not implement constitutional requirements, but go beyond those requirements and reflect a policy consciously chosen by our legislature to give added protection to minors. A violation of the requirements is not tantamount to violation of constitutional directives. When the statement was admitted into evidence there was no due process violation as was involved in Lynumn v. Illinois, 372 US 528, where the court found that the admission was coerced. In the instant case, there was only a violation of legislative directives which far exceed constitutional requirements.

In Lynumn the United States Supreme Court rejected the argument that the introduction into evidence of the coerced confession was harmless error, noting that the only other evidence of substance against the petitioner was the testimony of the person who had "set up" the petitioner, which person was a twice-convicted felon who admitted it was in his self-interest to cooperate with the police. The court quoted with approval from Payne v. Arkansas, 356 US 560, to the effect that even though there is sufficient evidence, apart from the coerced confession, to support a guilty verdict, the admission of the coerced confession into evidence over objection violated the due process clause of the Fourteenth Amendment, thereby vitiating the judgment.

■■ In the present case, however, the complained-of confession was not coerced or obtained in any manner violative of defendant's constitutional rights. The additional rights granted by Illinois statutes are not a part of due process; therefore, when the confession was admitted into evidence it was simply a violation of State policy, not due process. Under these circumstances, if

257

there was sufficient evidence apart from the statement to support the judgment of conviction, the admission into evidence of the statement would be harmless error.

The defendant chose to take the stand in this case, and admitted to being present during Zavala's fight with Moreno. The defendant testified: "So then we were going to leave and Zavala told me he was going to kill the guy, 'Help me carry him,' and I said 'No.' And he said, 'You are involved as much as I, and if you don't he is going to tell on me.'" When the defendant was asked what he then did, he said, "So, I was scared, you know, I just picked him up and—we started to pick him up and carry him." Defendant further admitted to throwing Moreno on the ice and said, "Zavala went in with the broken bottle and came out about ten or fifteen minutes later and said he killed the guy." The two then left the scene.

On cross-examination the defendant admitted that he heard Zavala say he was going to kill Moreno; that he did not call the police after leaving the body; that he had not tried to take away the broken bottle from Zavala; that he did not call for help; that he saw Zavala's hand moving up and down over Moreno's body, and that he went over and looked at the body after the cutting.

■ The question of the accountability statute was vigorously argued before the trial judge. Defense counsel argued that the defendant had done nothing sufficiently affirmative to allow him to be found guilty. However, the defendant admits dragging Moreno across the alley and standing by watching him murdered without attempting to stop Zavala. In People v. Bracey, 110 Ill App2d 329, 249 NE2d 224, the court discussed the accountability statute and cited with approval People v. Rudecki, 309 Ill 125, 140 NE 832, where it was held that if there is a common design to do an unlawful act, whatever occurs in the furtherance of the common design is the act of all, and the court said at page 129: "A shot

fired by one member of the mob was a shot fired by all of them, and all of them must answer for the result."

In the Accountability Act, Ill Rev Stats 1965, c 38, § 5–2, it is provided:

A person is legally accountable for the conduct of another when: (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.

In the instant case the trial court's error in admitting the statement did not involve an infringement of the constitutional rights of the defendant, and we find the error was harmless since independent evidence amply supports the conviction. The defendant elected to testify, perhaps in the hope that he could convince the trial court that he was a believable person, but in his testimony he made damaging admissions sufficient to justify the trial court's judgment. However, had there been no independent evidence to support the conviction, the case would have been reversed on the basis of the State's violation of section 703–2.

The judgment of the Circuit Court is affirmed.

Affirmed.

LYONS, P. J. and BURKE, J., concur.