**People of the State of Illinois, Plaintiff-Appellee,
v. Roosevelt Landgham, Defendant-Appellant.**

**Gen. Nos. 52,679, 52,973.**

First District, Fourth Division.

March 11, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Nunzio Tisci, Shelvin Singer, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and John R. McClory, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LEIGHTON delivered the opinion of the court.

After a jury trial, defendant was convicted of murder and sentenced to serve seventeen to twenty-five years. He appeals.

Defendant contends that in violation of Miranda v. Arizona[1] (1) he was not warned of his constitutional rights before he made oral statements admitted in evidence against him; (2) warnings of his constitutional rights were not repeated to him before he gave an inculpatory oral statement; (3) he did not knowingly and intelligently waive his constitutional rights before he gave the oral statements; (4) a written confession he gave was the product of the circumstances that produced the prior oral statements; and (5), he was not ade-

---

[1] 384 US 436, 16 L Ed2d 694, 86 S Ct 1602 (1966).

quately advised of his constitutional rights before he gave the written confession.

At approximately 6:00 in the morning of August 6, 1966, Samuel Jones, 6437 South Bishop in Chicago, found his son, Wendaland, age 8, dead in the alley behind 6439 South Bishop. Mr. Jones carried the body to his front porch and called the police. When they arrived, they inspected where the body was found. There the policemen saw what appeared to be a small pool of blood. From the alley, the policemen followed brown spots on the ground to a gangway between 6445 and 6447 South Bishop. More traces of blood were found on the pavement. After first looking in the rear area of 6445, the officers crossed the yard to 6447 where they discovered more blood on the concrete of the basement door.

6447 South Bishop was the home of Mr. and Mrs. Charles Strong and their five children. Defendant, a stepbrother of Mr. Strong, lived with them. Two sons of the Strongs, Charles, Jr., age 14, Ardell, age 6, and the defendant slept in the basement. The rest of the family slept upstairs. Three policemen went to the front of the Strong home and knocked on the door. Defendant opened it. One officer, Sergeant Gorman, identified himself and asked defendant if he lived in the building. Defendant said he did. Gorman asked defendant if he and his fellow policemen could look in the basement. Defendant replied, "Come on in." The officers did not have a search warrant. Sergeant Gorman did not tell defendant why he wanted to look. Defendant took Gorman and two officers to the basement. Everyone else in the house was asleep.

In the basement one of the officers opened the back door and saw what appeared to be bloodstains. A short time later, Mrs. Strong came from the upstairs portion of the house and asked the policemen what they were doing in her home. One officer explained to her that a

boy was killed; and that they had reason to believe the boy was killed in her basement. Mrs. Strong asked who the boy was; and on learning his identity, she gave permission for a search of the house. Mrs. Strong then left the basement and went upstairs with her two sons, followed by the defendant.

The policemen made a thorough search of the basement and discovered what appeared to be bloodstains on the refrigerator, on the floor, on five rags on the floor and on a lace curtain. In the upstairs portion of the house, Sergeant Gorman saw a pair of shoes which had brown spots on them. He asked who owned them. Defendant, who was then on a couch playing with a grandchild of Mrs. Strong, said they were his. At this point, because defendant became a suspect, Sergeant Gorman advised him of his constitutional rights. "[I] told Mr. Landgham that he had a right to remain silent, that anything he told me could and would be used against him in trial. I also told him he had a right to have an attorney present during the questioning, and also that if he could not afford an attorney we would see that the State would procure one for him." In the presence of Mrs. Strong, Sergeant Gorman and Officer O'Neil, defendant said that the day before Wendaland Jones and Ardell Strong had an argument; that Ardell stabbed Wendaland.

A short time later, Sergeant Gorman found a hunting knife in the kitchen covered with reddish-brown stains. The two officers ordered defendant to take off the clothes he was wearing and seized them as evidence. The stained shoes were also taken. Defendant was transported to Area 3 Headquarters of the Chicago Police Department. Mrs. Strong and her son Ardell were taken to the station in another vehicle. There, according to the two officers, defendant changed the statement he made earlier. He said that in the afternoon of the day before,

he, Ardell and Wendaland were in the basement of the Strong home. Ardell left. Defendant said that he had an urge, he picked up a knife and struck Wendaland in the chest. A short time after defendant made the inculpatory oral statement, Officer O'Neil called the office of the State's Attorney of Cook County. An assistant on duty spoke to him and asked if defendant was advised of his constitutional rights and whether defendant wanted to give a statement. Officer O'Neil answered both questions in the affirmative, although he did not explain the basis of his assertion that defendant was willing to give a statement. At about 12:00 noon, defendant was taken to the office of the State's Attorney where he gave a written confession. After the confession was transcribed, defendant corrected and signed it.

Evidence which the court heard on hearing of defendant's motion to suppress the oral statements and the written confession established that he was born in Mississippi where he attended school to the eighth grade. Although he lived in that state until he was 21, defendant never was gainfully employed there. In Chicago he worked at menial jobs before he moved in with the Strong family. While living with the Strongs, and at the time of his arrest, defendant was employed in a restaurant in the Chicago Loop. When he gave the written confession, he was asked whether he could read and write. Defendant answered, "A little, not much, not too much." Defendant denied he was warned concerning his constitutional rights; he denied making the written statement; and swore that "[I] told them I did not want to make a statement. . . . That's right." After hearing Sergeant Gorman, Officer O'Neil, Mrs. Strong, the Assistant State's Attorney, the court reporter who corroborated the other witnesses concerning the written confession, and defendant himself, the trial judge found that defendant was adequately warned of his rights and overruled the motion to suppress.

■ Defendant's motion to suppress questioned whether prosecution authorities complied with the mandate of Miranda when they took defendant's oral statements and the written confession. Sergeant Gorman testified that in the Strong residence, the morning of August 6, he gave defendant the Miranda warnings. This testimony was corroborated by Officer O'Neil and, more importantly, by Mrs. Strong, wife of defendant's stepbrother. By the requisite degree of proof, the evidence established that defendant was adequately warned of his constitutional rights before he was subjected to custodial interrogation. Narro v. United States, 370 F2d 329 (5th Cir 1966).

■ Implicit in the trial court's denial of defendant's motion to suppress was a finding that before he made the inculpatory oral statement at Area 3 Headquarters defendant had been adequately warned of his constitutional rights. Defendant challenges this finding with the contention that the record does not show he was given the Miranda warnings at the Headquarters. In other words, defendant contends that the warnings given him at the Strong home a very short time earlier that morning, should have been, but were not repeated. This contention, however, is answered by People v. Hill, 39 Ill2d 125, 233 NE2d 367, where the court said, 39 Ill2d 125, at 131–132:

It should be made clear that once Miranda's mandate was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview. To adopt an automatic second warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards envisioned by Miranda. Gorman v. United States (1st Cir) 380 F2d 158, 164.

16

Therefore, a second Miranda warning was not necessary immediately before defendant gave the inculpatory oral statement. People v. Sievers, 255 Cal App2d 34, 62 Cal Rptr 841 (1967).

Defendant's next contention is that the trial judge denied his motion to suppress although there was no evidence that defendant waived his Miranda rights before he gave the oral statements. Defendant points to the three witnesses who gave testimony concerning what occurred the morning of August 6. The witnesses were Sergeant Gorman, Officer O'Neil and Mrs. Strong. The record discloses that none of the three witnesses was asked any question which disclosed what the defendant did or said after Sergeant Gorman gave him the Miranda warnings. As a consequence, the record is silent concerning waiver by defendant of his constitutional rights prior to his giving the oral statements.

Defendant relies on the language of Miranda: 384 US 436, at 475:

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel.
>
> . . . . . .
>
> . . . a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.
>
> . . . . . .
>
> Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an ac-

17

cused was offered counsel but intelligently and understandingly rejected the offer.

■ From this, defendant argues that the record must reflect he expressly waived his constitutional rights. We reject this argument. The prosecution is not required to prove that defendant by some expression waived his constitutional rights after they were explained to him prior to custodial interrogation. United States v. Hayes, 385 F2d 375 (4th Cir 1967); Bond v. United States, 397 F2d 162 (10th Cir 1968). "[A]ny clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances." State v. Kremens, 52 NJ 303, 245 A2d 313, at 317 (1968).

■ The State attempts to meet the absence of a clear manifestation of waiver by defendant with the argument that the oral statements are proof of waiver. This argument, however, fails in the face of Miranda's mandate that "[a] valid waiver will not be presumed simply . . . from the fact that a confession was in fact eventually obtained." 384 US 436, at 475. Therefore, we must also reject the State's argument that defendant manifested a desire to waive his constitutional rights merely by making the oral statements.

■■ Waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. Johnson v. Zerbst, 304 US 458, 82 L Ed 1461, 58 S Ct 1019 (1938). When there is nothing in the record from which appears a clear manifestation of a desire to waive Miranda rights, oral or written statements taken are inadmissible. Moore v. United States, 401 F2d 533 (9th Cir 1968); Sullins v. United States, 389 F2d 985 (10th Cir 1968). In the record before us there is no proof that the defendant waived his constitutional rights.

18

Therefore, as to the oral statements, the trial court erred in overruling the motion to suppress.[2]

▮▮▮ From the absence of waiver defendant proceeds to the contention that the written confession he later gave was tainted by the circumstances that produced the oral statements. It is well settled that a confession which follows one coerced by intimidation, fear or other improper influence is presumed to be the product of the same influence. People v. Sweetin, 325 Ill 245, 156 NE 354. If a first oral confession is coerced, a later written confession is inadmissible. People v. Taylor, 33 Ill2d 417, 211 NE2d 673. A confession taken from an accused subjected to an illegal arrest or an unreasonable search and seizure, is presumed to be the product of the illegality. People v. Johnson, 75 Cal Rptr 401, 450 P2d 865 (1969); Killough v. United States, 315 F2d 241 (DC Cir 1962). On a showing of illegal police conduct, the burden falls on the prosecution to prove that the connection between the illegality and the obtained confession was so attenuated as to dissipate the taint. Collins v. Beto, 348 F2d 823 (5th Cir 1965). The lesson of the cases is that taint is predicated on illegality. Therefore, we must determine whether on August 6, either at the Strong residence or at Area 3 Headquarters, there was illegal police conduct.

▮▮▮ Defendant was arrested on probable cause. In one of his first oral statements to the police he accused a six-year-old boy of murder in the attempt to extricate himself from suspicion. At Area 3 Headquarters, defendant was asked by Officer O'Neil to repeat the accusation in the presence of the six-year-old boy. He elected, instead, to make the incriminating statement.

---

[2] For recent examples of the "articulation and the surrounding facts and circumstances" from which this court found waiver of constitutional rights, see People v. Johnson, 112 Ill App2d 148, 251 NE2d 393 and People v. Zepeda, 116 Ill App2d 246, 253 NE 2d 598.

Defendant had been adequately advised of his constitutional rights. At the hearing of his motion defendant admitted he understood the advice given him. Although it was error for the trial court to admit testimony of defendant's oral statements without a showing of waiver, it was not illegal police conduct for Sergeant Gorman and Officer O'Neil to listen to what defendant chose to say.

It is significant that when defendant testified in support of his motion to suppress, he did not claim there was any connection between the oral statements and the written confession. In People v. Raddatz, 91 Ill App2d 425, 235 NE2d 353, an accused was subjected to custodial interrogation without benefit of the Miranda warnings. The State conceded inadmissibility of the oral confession obtained. A short time later, an Assistant State's Attorney took a written confession. Prior to trial a motion was made to suppress both the oral and the later written confession. At the hearing on the motion, the accused testified that when he was questioned by the Assistant State's Attorney he thought that having confessed orally, there was nothing else he could do but give the written confession. The trial judge, relying on Westover v. United States, a companion case to Miranda, sustained the motion and suppressed the oral and written confessions. On appeal to this court, we sustained the trial court.

 In the case before us the Miranda warnings were given. No illegal police conduct was used to obtain the oral statements. Contrary to Raddatz, defendant did not claim, nor did he show, that his decision to give the written confession was in any way influenced by what he had said orally. Therefore, defendant's contention that the written confession was tainted by the circumstances that produced the oral statements is without merit.

Defendant's next contention is that the written confession was taken from him without adequate warnings of

his rights under Miranda. This confession was taken by an Assistant State's Attorney.

Miss Davis: ". . . Now before I take a statement from you, I will first ask if I told you that you do not have to give a statement, that if you did give a statement, it could be used in evidence against you at the trial."

Defendant: "Yes."

Q: "You are entitled to have a lawyer while we take the statement, if you want to give it, and if you can't afford to hire one, you are entitled to have a lawyer at no cost to yourself. Do you understand that?"

A: "Yes."

Q: "Now knowing that, do you still want to give me a statement?"

A: "Yes."

Q: "Has anyone promised you anything to give a statement or said they would hurt you if you didn't give a statement?"

A: "No."

Q: "No one has threatened you in any way in order to get you to give a statement?"

A: "No."

Q: "This statement is voluntary on your part?"

A: "Yes."

Q: "Without anyone forcing you to give a statement."

A: "That's right."

Q: "Knowing that you don't have to give the statement?"

A: "That is right."

21

After the confession was completed, the court reporter transcribed it from his notes. He returned a short time later with a written copy which was read to defendant by Miss Davis. Defendant followed Miss Davis as she read. Defendant made a correction, initialed the pages and signed his name. The officers present witnessed his signature.

■■■ Defendant contends that the warnings given him by Miss Davis did not comply with the requirements of Miranda because she told him "[N]ow before I take a statement from you, I will first ask if I told you that you do not have to give a statement, that if you did give a statement, it could be used in evidence against you at the trial." Defendant argues that these words did not advise him he had the constitutional right to remain silent. We find no merit in this contention. The words of Miranda do not constitute a ritualistic formula which must be repeated without variation in order to be effective. Words which convey the substance of the warning along with the required information are sufficient. United States v. Vanterpool, 394 F2d 697, at 698–699 (2nd Cir 1968). Consistent with this principle, we recently said in People v. Bosveld, 109 Ill App2d 317, at 320–321, 248 NE2d 697:

> Miranda is not a ritual of words to be recited by rote according to didactic niceties. What Miranda does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.

Moreover, in Miranda the court with approval quoted from a letter of the Solicitor General which said: " ' [T]he standard warning long given by Special Agents of the FBI to both suspects and persons under arrest is that the person has a right to say nothing and a right to counsel, and that any statement he does make may be used against him in court. . . .' " 384 US 436, at 484. The Miranda opinion discloses frequent use of the word "statement" to mean speech.[3] In fact, in an introductory paragraph, Mr. Chief Justice Warren said: "[P]rior to any questioning, the person must be warned . . . , that any statement he does make may be used as evidence against him, . . ." 384 US 436 at 444.

██ ██ Statement means "[t]he use or process of stating, reciting, or presenting orally or on paper; . . . something stated as a report or narrative of facts, events or opinions; . . ." Webster's Third New International Dictionary (1966). Therefore, despite some authority to the contrary,[4] we think it the better view that when prior to custodial interrogation defendant was told that he did not have to make a statement, he was told he had the right to remain silent.[5] After being so advised, defendant was warned concerning his constitutional rights to counsel. He was asked if he understood the advice given him. He said he did. Then he was asked, "[N]ow knowing that, do you still want to give me a statement?"

---

[3] See, for example 384 US 436, at 475: "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver."

[4] United States v. Fox, 403 F2d 97 (2nd Cir 1968); but see the dissenting opinion of Judge Moore, 403 F2d 97, at 104.

[5] For cases in which the word "statement" is used in this sense, see State v. Renfrew, 280 Minn 276, 159 NW2d 111 (1968); Penn v. Commonwealth, 210 Va 242, 169 SE2d 427 (1969); State v. McKnight, 52 NJ 35, 243 A2d 240 (1968); State v. Bonner, 252 La 200, 210 So2d 319 (1968); Abbott v. Beto, 409 F2d 1324 (5th Cir 1969); People v. Raddatz, 91 Ill App2d 425, 235 NE2d 353.

Defendant answered "Yes." Defendant gave the written confession. The questions and the responses given show that defendant understood the warnings and voluntarily relinquished his rights. United States v. Hayes, 385 F2d 375 (4th Cir 1967); Alexander v. United States, 380 F2d 33 (8th Cir 1967). The trial court properly overruled defendant's motion to suppress the written confession.

In the jury trial, the oral statements and the written confession were admitted in evidence. As we have concluded above, admission of the oral statements without proof of waiver violated defendant's Miranda rights. Were the oral statements defendant's only inculpatory utterances, this error would result in reversal of the conviction in this case. However, there are circumstances under which failure to comply fully with Miranda can be harmless. Commonwealth v. Padgett, 428 Pa 229, 237 A2d 209 (1968).[6] Errors of a constitutional nature can be regarded as harmless, if we are able to declare beyond a reasonable doubt that the error did not contribute to the finding of guilty. Chapman v. California, 386 US 18, 17 L Ed2d 705, 87 S Ct 824 (1967); People v. Smith, 38 Ill2d 13, 230 NE2d 188. When we say the error did not contribute to the finding of guilty, we mean that the erroneously admitted evidence did not prove an element of the crime not established by other properly admitted evidence. In making this declaration "[o]ur judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the [oral statements] on the minds of an average jury." Harrington v. California, 395 US 250, at 254, 23 L Ed2d

---

[6] See Soolook v. State (Alaska), 447 P2d 55 (1968); People v. Doherty, 67 Cal2d 9, 429 P2d 177 (1967); Duckett v. State, 3 Md App 563, 240 A2d 332 (1968); Guyette v. State (Nev), 438 P2d 244 (1968); State v. Gillespie, 100 NJ Super 71, 241 A2d 239 (1968).

284, 289 S Ct 1726 (1969). Necessarily, to make this declaration, we must eliminate the other evidence on which the jury could have predicated its verdict. People v. Smith, supra.

This evidence consisted of twelve exhibits and twelve witnesses for the prosecution; one witness, defendant himself, and a group of exhibits for the defense. The prosecution exhibits were photographs, a gray shirt, rags which contained blood, a curtain with blood, a knife, defendant's pair of shoes which had blood on them and defendant's written confession in which he identified the knife, described how he stabbed and killed Wendaland Jones.

The first two witnesses for the prosecution were Wendaland Jones' parents. Beulah Jones, the mother, testified concerning the life condition of Wendaland before he was found dead. Samuel Jones, the father, described how he found the boy's body during the early morning hours of August 6th. Ineary Strong, wife of defendant's stepbrother, gave testimony from which the jury could have found that defendant saw Wendaland on August 5, 1966. Mrs. Strong described what occurred the morning of August 6th when she gave police officers permission to search her home. She described to the jury the conversation she heard among defendants, Sergeant Gorman and Officer O'Neil. She said the officers discovered a pair of shoes. When asked who owned the shoes, defendant said they belonged to him. Mrs. Strong said that it was then that Sergeant Gorman warned defendant of his constitutional rights. A short time later, according to Mrs. Strong, Officer O'Neil found a knife in her kitchen.

Officer O'Neil was the only other witness who described oral statements the defendant made the morning of August 6th. His testimony was more detailed. He described his arrival at the Jones' residence. O'Neil said that from the place where deceased was found, to

the rear of 6447 South Bishop, he and his fellow officers followed what appeared to be bloodstains. O'Neil said that when they knocked on the door of the Strong residence, defendant answered and admitted them to a basement where he saw what appeared to be bloodstains between the two rear doors, on some rags, on a lace curtain, near and on a refrigerator, and on some clothing. After the pair of shoes with what appeared to be bloodstains on them was found, defendant said they were his. O'Neil's testimony concluded with his description of defendant's oral statements.

The other eight witnesses for the prosecution were two crime laboratory officers who identified the exhibits taken from the Strong residence; the official court reporter who took defendant's written confession; the Assistant State's Attorney, Miss Barbara Davis, who told the jury how she took the written confession; a coroner's pathologist, Dr. John Belmonte who described the injuries found on Wendaland Jones and gave the cause of death as a laceration of the heart from a gaping wound in the chest; and finally, three laboratory technicians who identified as blood the brown spots which Officer O'Neil testified he saw on the lace curtains, on the rags, including those on defendant's pair of shoes.

Defendant then testified. He told the jury of his birth in Mississippi, his limited education there, and his move to Chicago where he held menial jobs up to the time of his arrest. He corroborated prosecution witnesses concerning the arrival of the police at the Strong home on August 6th. He denied making the oral statements attributed to him by Officer O'Neil at Area 3 Headquarters; and he denied giving and signing the written confession.

The written confession in every material respect was almost identical in its inculpatory aspects to the oral statements defendant made during the morning of Au-

26

gust 6th and which Mrs. Strong and Officer O'Neil described to the jury. Thus, in the trial of the charge against defendant, the oral statements did not prove any element of the crime that was not established more strongly by other competent evidence. Therefore, when we compare the overwhelming evidence of defendant's guilt with the evidentiary worth of the testimony concerning defendant's oral statements heard by the jury, we have no hesitancy in declaring beyond a reasonable doubt that admission in evidence of the oral statements without adequate proof of waiver was harmless error. Judgment is affirmed.

Judgment affirmed.

DRUCKER and ENGLISH, JJ., concur.