**People of the State of Illinois, Plaintiff-Appellee, v. Willie Rush, Defendant-Appellant.**

Gen. No. 52,769.

First District, Second Division.

June 2, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Chester P. Majewski and James J. Doherty, Assistant State's Attorneys, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Laurence J.

Bolon, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

Willie Rush was found guilty, following a bench trial, of the offense of attempt robbery (Ill Rev Stats (1965), c 38, § 8–4). Judgment was entered on the finding and he was sentenced to a term of not less than one nor more than seven years in the Illinois State Penitentiary. In this appeal he contends that the trial court erred in denying his motion to strike certain testimony and that he was not proven guilty beyond a reasonable doubt.

Roterick McLaughlin, a Chicago Police Officer, the first witness called by the prosecution, testified as follows. At approximately 2:30 a. m. on the morning of March 5, 1967, he left his home to procure some medicine for his infant son. He went to a store known as the Big B, located at Central Park and Roosevelt Road in the City of Chicago, but was unable to procure the drugs which he sought. On his return, he parked his car in the vicinity of 3150 West Harrison, some three city blocks from his home, and proceeded toward home on foot. He explained that the car was left behind because it had been subject to vandalism when parked near his home.

While walking toward his home, he was accosted by a male figure who had been standing in a doorway at 3203 West Harrison. The man called to him and when witness turned, the man, pointing an automatic pistol at witness, said, "This is a stickup." Witness then announced his office as a Chicago Police Officer and drew his service revolver. The man stepped back, stating that he would shoot, then fired one shot and retreated up the staircase of the building in front of which he had been standing. Witness returned fire, shooting at the fleeing man three times.

Hesitating before following the man up the stairs, McLaughlin heard the sound of glass breaking. When he did climb the stairs, he observed that the glass in a door at their crest had been broken and there he found an automatic pistol. McLaughlin did not conduct an exhaustive search of the apartments on the second floor of the building into which his assailant had fled. He did, however, proceed through the building via the second-floor hallway and exit through the rear door. He was unable to find the assailant.

McLaughlin further testified that he then returned to the front of the building where he spoke with police officers Bolton and Vavrin. He sat in their car while they prepared a report of the incident and gave them a description of the defendant. At trial McLaughlin described the assailant as being five feet, nine to five feet, ten inches tall and weighing one hundred eighty to one hundred ninety-five pounds. He appeared to be wearing a wig which had a blond streak in it, and wore lipstick.

Later that same morning, witness went to Illinois Research Hospital in response to a call. There he observed the defendant and identified him as the assailant.

Laddie Vavrin, the second witness called by the prosecution, testified as follows. On March 5, 1967, he was a Chicago Police Officer assigned to the Eleventh District. At approximately 3:30 a. m. on that date he and his partner were in a squad car proceeding south on Kedzie Avenue near Harrison when they heard shots being fired. He observed a man with a gun at the front of a building located at 3203 West Harrison. After being ordered to drop the gun, the man identified himself to Vavrin as Officer McLaughlin of the Chicago Police Department. After a short conversation with McLaughlin, witness proceeded to the rear of the building where he observed fresh footprints in the snow. He followed the footprints to Flournoy Street where they mingled with

other prints. Witness then returned to the front of the building where he had encountered McLaughlin.

Witness, his partner, and McLaughlin then returned to the squad car where witness took a statement from McLaughlin, including a description of his alleged assailant. Thereafter, McLaughlin left the car and witness and his partner resumed their regular patrol.

An hour to an hour and one half later, witness and his partner, in response to a radio call, drove to Illinois Research Hospital to investigate a report that an individual was there being treated for gunshot wounds. Upon arrival, witness observed defendant who was being treated for such wounds. Vavrin asked defendant what had happened, to which defendant responded that he had been shot while in the vicinity of Pulaski and Flournoy Streets, when he attempted to flee from three would-be robbers. (At this point defendant objected to the testimony on Miranda grounds and moved that it be stricken. The motion was denied.)

Vavrin also testified that while at the hospital he was aware that the defendant closely resembled the description given him by Officer McLaughlin. Vavrin described Rush, as he viewed him in the hospital, as having black hair with a section of light colored hair at about the center of his forehead, round face, medium build, and as having smeared lipstick on his mouth. Finally, Vavrin testified that he was separated from his partner, Officer Bolton, once at the hospital, when the latter left the emergency room to phone Officer McLaughlin. The defendant was not in custody at the time witness conversed with him.

Elizabeth Dawson, first witness called by the defense, testified as follows. On March 5, 1967, she lived in the building located at Harrison and Kedzie in the City of Chicago. She could not recall the exact street address. At approximately 2:30 a. m. on that date, she was at

139

home and preparing to retire when she heard three shots fired and then heard someone call for help. She recognized this voice to be that of Willie Rush. She went into the hall and found Rush leaning against the wall. She knew that he was injured and could see that he was bleeding but did not ask him what had occurred. Rush asked her for help and she took him to her room where she gave him a towel. While in the hall, she observed a number of other people, also in the hall, but did not recognize any of them. She did not see a police officer in the hall nor did she see anyone with a gun. The defendant remained in her room for approximately fifteen minutes and then left via the rear door. Miss Dawson also testified that she had known the defendant for two years but had never known him to wear lipstick or other makeup or to have a blond streak in his hair.

Finally, Miss Dawson testified that she was employed as a cashier at the Big B Super Market and was so employed on March 5, 1967. Due to her employment she was familiar with the goods sold. Aspirin, but no other drugs, was sold at the Big B.

Velma Rush, an aunt of the defendant also called on his behalf, testified as follows. On March 5, 1967, she went to a hospital where she observed the defendant as he was being treated for gunshot wounds. While there she engaged in a conversation with the witness McLaughlin. During the course of the conversation she observed that his eyes had "a sleepy look" and that his breath smelled of alcohol.

Willie Rush took the stand on his own behalf and testified as follows. At approximately 2:30 a. m. on the morning of March 5, 1967, he left the Peppermint Lounge, located just off the corner of Kedzie and Harrison Streets and walked down about three doors to a bus stop. He waited there to hail a cab or bus as it was a cold night. As he stood there, he observed McLaughlin

140

walking toward him from the opposite side of the street. McLaughlin, tie loosened, was wearing a loud colored coat and carrying another coat. It took him a long time to cross the street and someone shouted for him to get out of the street. When McLaughlin paused to adjust his slacks, Rush observed that he had a gun in his belt.

McLaughlin engaged Rush in conversation and eventually asked Rush to "go kneel on him." Defendant refused and stated that he was not looking for any trouble. When he turned to leave, McLaughlin drew an automatic pistol and asked where he was going. Rush responded that he lived in the building in front of which they were standing and started up the stairs. McLaughlin then began shooting at him, hitting him in the back portion of his left thigh, right arm, and upper portion of his back.

Defendant continued up the stairs and knocked on the door at the top. When a lady opened the door, defendant told her that he had been shot and asked for help. Elizabeth Dawson took him to her room and gave him a towel. He did not call the police as Miss Dawson did not have a phone. After leaving Miss Dawson's room, he exited the building through the side door and took a cab to Illinois Research Hospital. While at the hospital, the doctors who treated him allowed only one detective to converse with him. All other police officers present stood near the door.

Finally, defendant testified that he had known Miss Dawson for two years and that he did not tell her that he had been shot. He never had a light streak in the middle of his hair, but at one time the sides were tinted.

■ Defendant first contends that the trial court erred in denying his motion to strike that portion of Officer Vavrin's testimony relating to a conversation alleged to have taken place between Vavrin and defendant at the hospital. In support of this contention he argues first, that a Miranda warning was mandatory in

141

that at the time of the alleged conversation he was a suspect and had been denied his freedom of action in a significant manner. He then points out that there is no evidence in the record that he was given the fourfold warning required by Miranda v. Arizona, 384 US 436, 86 S Ct 1602 (1966), prior to the time that the statement attributed to him was allegedly made. The State has argued only that Miranda warnings were not required, as defendant was not under arrest at the time in question. Thus, the issue formed by the briefs is whether, at the time of the alleged conversation, the factual setting was such as to require that Miranda warnings be given. We do not believe, however, that the resolution of this issue is dispositive of the case. Even if it were to be decided that such warnings should have been given and that as a consequence it was error to deny defendant's motion to strike, it does not necessarily follow that the judgment must be reversed. The commission of error of constitutional dimension by the trial court does not necessarily dictate that that court's judgment be reversed. See Chapman v. California, 386 US 18, 87 S Ct 824 (1967).

■ In People v. Landgham, 122 Ill App2d 9, 257 NE2d 484, this court stated:

Errors of a constitutional nature can be regarded as harmless, if we are able to declare beyond a reasonable doubt that the error did not contribute to the finding of guilty. Chapman v. California, 386 US 18, 87 S Ct 824, 17 L Ed2d 705 (1967); People v. Smith, 38 Ill2d 13, 230 NE2d 188. When we say that the error did not contribute to the finding of guilty, we mean that the erroneously admitted evidence did not prove an element of the crime not established by other properly admitted evidence.

In the present case, not only does the testimony complained of not relate to an element of the offense charged and not proven by other evidence properly admitted, the testimony in question does not relate to an element of the offense at all.

In support of his second contention, that he was not proven guilty beyond a reasonable doubt, defendant advances the following proposition. Since the only evidence supporting the charge against the defendant is the testimony of McLaughlin and since the defendant has denied the charge, this court can affirm the judgment of conviction only if it can find some reasonable basis for the trial court's believing the testimony of McLaughlin and not that of defendant. The suggestion is then made that McLaughlin had ample reason to perjure himself.

■ This proposition is in direct conflict with the law in this State and its underlying rationale. It has long been held that it is the function of the trier of fact to determine the credibility of witnesses and the weight to be given their testimony. A court of review will not substitute its judgment for that of the trier of fact in this regard unless the evidence is so improbable or unreasonable as to leave a reasonable doubt of defendant's guilt. The reason for the rule is obvious. The trier of fact is in a much superior position to judge credibility since it is the trier of fact and has the opportunity to view the demeanor of the witnesses, a primary factor in determining credibility. Except in cases where the evidence is improbable or contrary to human experience, or where a witness is shown to be unworthy of belief, the reasons supporting the determinations of credibility made by the trier of fact are not likely to be found in the insensitive pages of a report of proceedings. Thus the search of the record which defendant urges woud be doomed to futility. As a result, reviewing courts would

143

be compelled to substitute their own judgment of credibility for that of the trier of fact, in direct contradiction of the established rule.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

McCORMICK, P. J. and BURKE, J., concur.