THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL PARRA, Defendant-Appellant.

First District (2nd Division) No. 55444

Opinion filed December 31, 1975.

LEIGHTON, J., dissenting.
DOWNING, P. J., specially concurring.

Jerome Rotenberg, of Rotenberg, Schwartzman & Richards, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago (Elmer C. Kissane and Zenon Forowycz, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

In Indictment No. 69-972, Michael Parra (hereinafter defendant) was charged with the offenses of murder (Ill. Rev. Stat. 1967, ch. 38, par. 9—1(a)(1) and par. 9—1(a)(2)) and with the offense of involuntary manslaughter (Ill. Rev. Stat. 1967, ch. 38, par. 9—3(a)) in the death of Sharon Dobosz, who died as a result of injuries sustained by having been struck by an automobile. After a jury trial, defendant was found guilty of the offense of reckless homicide (Ill. Rev. Stat. 1969, ch. 38, par.

9—3(b)).[1] He was sentenced to a term of not less than two nor more than five years in the Illinois State Penitentiary. From that judgment and sentence, defendant appeals. He was admitted to post-conviction bail pending the disposition of his appeal.

In his appeal, defendant raises eight issues. Of these issues, the most important is whether the evidence is legally sufficient to sustain his conviction. The consideration of this issue requires the following detailed recital of the evidence adduced at the trial, which recital we now undertake.

Cheryl Dobosz, the mother of the victim, testified that her daughter, Sharon Dobosz, resided alone in a second-floor apartment at 5903 West Huron Street in Chicago.[2] On 18 November 1968, Sharon had visited at the home of her parents, arriving at about 7:15 p.m. and leaving at about 7:40 p.m. The witness next saw her daughter at about 5 a.m. on the following morning in the emergency room of the West Suburban Hospital. The witness made an in-court identification of a photograph of her daughter, of five articles of clothing which her daughter had been wearing on the night of 18 November, and of Michael Parra, the defendant. The witness testified that Sharon had known defendant for about nine or ten months. At the hospital, defendant had given the witness' husband a keycase containing keys to Sharon's apartment. The witness recognized the keycase as one which her husband had given to Sharon. Over objection, the witness was permitted to identify the signature of her daughter on a document identified as People's Exhibit 3. Unknown to the jury at this stage of the trial, this document was an insurance policy on the life of Sharon; under the terms of the policy, defendant was the designated beneficiary.[3]

Walter Frank Dobosz, the father of the victim, testified to substantially the same matters as his wife and made the same identifications of the photograph, the articles of clothing, and the signature of their daughter on People's Exhibit 3. In addition, he stated that, at the hospital, his wife had said: "Who could have done this awful thing?" Whereupon defendant had hit his fist on a wall. Defendant's motion to strike this item of testimony was denied. According to the witness, de-

---

[1] Reckless homicide is an offense statutorily included within the offense of involuntary manslaughter; it may be committed when the involuntary manslaughter is the result of the reckless operation of a motor vehicle.

[2] In Chicago, on the streets which run east-west, odd-numbered addresses are on the south side of the street and even-numbered addresses are on the north side of the street.

[3] This was the first step in an effort by the State to impute to defendant a financial motive for killing Sharon Dobosz.

fendant then asked a police officer whether he (defendant) could go back to secure the victim's apartment; the police officer told defendant he could not. Defendant then gave keys to the apartment to the officer, who requested the witness to return to the apartment and lock it up, which the witness did. The witness was shown a keycase and recognized it as being one which he had previously given to his daughter. The witness testified that he had recovered People's Exhibit 3 from his daughter's apartment, and that the insurance policy was among papers which he had found in her apartment two days after her burial. Defendant moved for a mistrial on the ground that People's Exhibit 3 had now been identified to the jury as an insurance policy. The motion was denied, but the jury was immediately instructed to disregard the description of People's Exhibit 3 as being an insurance policy.

Donna Mary Dobosz, the sister of the victim, testified that she saw Sharon at the witness' own apartment at about 8:10 p.m. on 18 November 1968. The victim arrived in Michael Parra's automobile. The victim made a telephone call at about 9 p.m. and then left the apartment at about 9:20 p.m. The witness identified the photograph of Sharon, the five articles of clothing which Sharon had been wearing, and Sharon's signature on People's Exhibit 3.

Janet Selers testified that she was visiting the apartment of Anna Palana at 5903 West Huron Street in Chicago on the evening of 18 November 1968. At about 11 or 11:30 p.m., she and other persons in the front room of the apartment of Anna Palana heard arguing between a man and a woman coming from upstairs. She next heard footsteps coming down the stairs, first one set of footsteps and then a minute later a second set. She testified that she heard the woman's voice say: "Mike, I want my keys." The second set of footsteps sounded as if the person did not have shoes on. The footsteps then went outside, and a door slammed from outside. The witness went to a window in the front room of Anna Palana's apartment, which window faced north. When she looked through the window, she saw a white Pontiac Tempest convertible parked in front of the building at 5903 West Huron, on the south side of the street facing west. She had seen the automobile before. She heard the woman's voice saying again in a loud tone: "Mike, I want my keys." She and the other persons in the room then sat down and began to talk. She then got up again and looked out a window of the front room, which window faced west; she saw the white Pontiac making a right turn onto Austin Boulevard, which is a northsouth street (6000) at the west end of the 5900 block of West Huron Street. "At about not even a second" later, she noticed the white car again in front of Anna

Palana's apartment headed west. The white car then approached a body lying in the street; the car stopped; the driver got out of the car, looked at the body, and got back into the car. The witness was unable to determine who the driver was.

After the driver got back into the car, he drove around the body to Austin and made a right-hand turn onto Austin. The witness and Anna Palana then went outside when they noticed the body. They went up to the body and a Fire Department ambulance came headed west on Huron. The same white car then drove up headed east on Huron and the driver got out. The witness testified that the victim said: "Mike, if I ever needed you, I need you now."

The witness did not see the driver of the car so as to be able to identify him. The driver of the Pontiac asked the ambulance driver where they were taking the girl. The witness did not see the white Pontiac leave the scene. The witness identified People's Exhibits 4 and 5 as pictures of the white Pontiac convertible.

On cross-examination the witness testified that, after she heard the car's engine start, she heard the girl ask for her keys for the second time. The voice sounded like it was outside the car. When the witness looked out of the apartment for the second time thru the front room window which faced west, she did not see anything in the street but saw the white Pontiac down by the corner at Austin Boulevard. The witness did not see a female then running down the street nor on the sidewalk.

The next time the witness looked out the window, the white Pontiac was again stopped in front of the apartment, on the south side of Huron Street facing west, but the witness did not know how much time had elapsed. At the time she noticed the white Pontiac again in front of the apartment, she first noticed the body in the street. From the time that the witness first looked out the front window facing west and saw the white car make a right turn at Austin until she saw it again in front of 5903 West Huron facing west was about a "second or so" later. After stopping in front of the apartment, the driver drove up to the right of the body. He parked in the middle of the street. There were other cars parked along the curb (on the north side of the street).

The only conversation this witness heard was the girl asking for her keys. The witness did not hear any noise that sounded like a car running over a body, nor did she hear a screeching of brakes.

Anna Palana testified that on 18 November 1968 she was living at 5903 West Huron, which is a two-story apartment building containing four apartments. The witness lived in the west apartment on the first floor. Shortly after arriving home from work at about 10:30 or 10:45

p.m., the witness heard an argument between a man and woman coming from the apartment directly above hers. The witness recognized the girl's voice as that of Sharon Dobosz. The witness heard one person leave and go downstairs. Shortly thereafter she heard a second person going down the stairs. The witness heard the girl calling on the stairway "Mike, give me my keys," and "I need my keys." The witness heard the doors to the building slam and again heard the girl hollering for her keys from outside of the apartment.

The witness went to the window facing north and didn't see anything. She went to the window facing west and saw a small white car going towards Austin. The car was a couple of doors from the corner of Austin when she saw it. When the white car reached Austin, it made a right turn. The witness next saw the car come around the corner from Mayfield (a north-south street at 5900 West), making a right turn on to Huron and traveling west. The car pulled up in front of the apartment building for a second or two, pulled away, and again stopped. The witness then first saw the body lying in the street. The driver got out of the car, bent down a little bit, got back in the car, and drove off again. The driver had stopped approximately in front of 5938 West Huron. The witness had seen the car on numerous occasions but had not seen the driver. She had seen Sharon Dobosz drive the car. The witness then identified the car from photographs (People's Exhibits 4 and 5).

After the white car had pulled away again, the witness left the apartment with Janet Selers and both went to the body. After they got to the body, an ambulance pulled up and then the car the witness had identified from photographs came from the west and pulled up on the north side of the street. As they were putting the victim in the ambulance, she said: "Mike, if ever I need you, I need you now." The witness did not remember seeing the car leave the scene. When the witness had seen the white car approaching Austin Boulevard for the first time, the witness had not then seen a body on the street.

On cross-examination, the witness testified that she saw the white Pontiac approximately three times on the night of 18 November 1968. The first two times were prior to her going out of her apartment; the third time was after she had left her apartment and had gone to approximately 5938 West Huron.

When she had first looked out the west window of the apartment towards Austin, the witness had not seen any bodies lying in the street. When the witness then first had seen the white car, it had already proceeded beyond the point of 5938 West Huron. A minute or so later, the white car pulled up and stopped in front of 5903 West Huron headed

west. The driver then pulled away, drove a little better than a half block, stopped again, and got out. The driver then drove off again and turned right on Austin Boulevard.

The witness did not see the white car hit the body, or hear screeching of brakes or anything that sounded like a body being dragged along the street. The witness could not identify the driver of the white car.

Teresa Garcia Terrana testified that on 18 November 1968, the witness' mother lived in the third-floor apartment at 5933 West Huron. At 11:30 P.M., the witness was going to visit her mother. The witness was in front of 5933 West Huron when she first observed a girl running after a car, yelling something about wanting her keys. The car was a Pontiac convertible, white with a black top, and was then about three houses down the street to the east of the witness [hence, about in front of 5927 West Huron]. The car stopped directly opposite the witness. The witness heard "loud voices between the driver and the girl", and heard the girl crying. The witness identified the driver of the car as Michael Parra.

The girl was outside the passenger side of the car. The witness heard the loud voices for approximately two or three minutes. The witness then heard a thud, like a car door closing, and then saw the white car go towards Austin Boulevard.

The witness entered the apartment building at 5933 West Huron and stopped first to visit her girlfriend in the first-floor apartment. She glanced out the window and saw something lying in the street. The witness went out and saw a girl lying in the street. The witness was then shown a photograph of the deceased. She identified the person shown in the photograph as the girl who was lying in the street. The man who had been talking to the victim then came back driving the same car eastward on Huron Street. He parked on the north side of the street. After the ambulance left, the driver of the white car pulled into a driveway and went west towards Austin. The witness saw blood in the street in front of 5933 West Huron.

On cross-examination, the witness testified that, when she first saw the car from her position in front of 5933 West Huron, the girl was about 15 to 20 feet behind the car and was running after it. As the witness was about to go up the outside stairs leading to the apartment building at 5933, the car was slowing down and the girl was right behind it. As the witness was going in the entrance doorway, she heard the thud to which she had referred, and saw the car drive away, but did not see a body.

She was in her girlfriend's apartment for about five minutes before she noticed the body in the street. The white car came back from the direction of Austin Boulevard after the witness had gone back outside. The

ambulance was there when the car came back. The witness never saw the girl get in front of the car.

John Harrington testified that on 18 November 1968, he resided at 5921 West Huron. At about 11:30 P.M., he was in bed asleep. He heard a girl screaming "I got no keys." He went to the front room window facing north and saw a girl lying in the middle of the street, about 15 or 20 yards west of his apartment under a street light. An elderly man walked up and bent over her. The witness observed car headlights approaching the two persons in the street from the east; the car had already passed Mayfield Avenue and was in the same block of West Huron Street as the two persons. When the car passed his apartment, it was going about 30 to 35 miles per hour. The car went right over the body of the girl; its wheels appeared to straddle the girl's body, but the body spun around in the street. The car did not stop; it kept going west on Huron to Austin. The car was a light-colored intermediate car.

On cross-examination, the witness testified that he saw an elderly man walk up to and bend over the girl. The girl did not move at all. The witness was at the window about a minute when the car went over the body. The witness could not observe the driver of the car that hit the girl or tell whether there was more than one person in the car. The car was a cream or light-colored car. He didn't know whether it was a hardtop or convertible. Blood was forming around the body after the body was struck by the car.

Joan Amatore testified that, on 18 November 1968, she was visiting her girlfriend Veronica Burbo who lived in the second-floor apartment at 5933 West Huron. They were in the front bedroom. The witness looked out the window and saw a body in the street. She saw an old man walking over and then a car pulled up. The driver was male; she could not identify him. Her girlfriend called an ambulance.

On cross-examination the witness testified that, prior to observing the body, the witness did not hear the noise of a car sounding as though it had been in contact with any other object. The white car with black top came from the east going west. The car stopped five feet from the body. The witness did not observe the car run over the body. There was a lot of blood in the street. When the ambulance arrived, the same white car with the black top came back from the west and parked on the north side of the street.

Veronica Burbo testified that she resided at 5933 West Huron on the second floor. The witness saw a body lying in the street. After she called the ambulance, she went back to her window and saw an old man trying to help the victim. She went outside and waited for the ambulance. After the ambulance drove up, a white car drove up. The defen-

dant, Michael Parra, was driving. The car was not near the body or the blood in the street.

On cross-examination the witness testified that, when the car in question drove up, the ambulance was already there. Prior to seeing the body, she had heard no unusual noises.

Ann Burbo, the mother of Veronica, testified that on 18 November 1968, she lived in the second-floor apartment at 5933 West Huron. On that night she was visiting in the third-floor apartment. She saw a body in the street. A little girl hollered and she went to the window of the apartment. She went outside and saw that the body was that of a female. The witness attempted to talk to the body but received no response. A white car with a black top pulled up. The driver came from the direction of Austin Boulevard and parked on the north side of the street facing east. He parked two or three car lengths west of the body. The witness identified the defendant as the driver of the car. The girl hollered: "Mike, Mike." He came running and hugged her and grabbed her like he was sorry that she was hurt. The witness knew he said he was sorry. Later, an ambulance pulled up and they put her into the ambulance.

On cross-examination the witness testified that the defendant was at the scene when the ambulance drove up. He was there while they were putting the victim in the ambulance.

Eileen Deasey Shannon testified that, on 18 November 1968, the witness was living at 5927 West Huron. She and her sister were upstairs in a bedroom when they heard screaming. The voice was female. The noise came from the street, and seemed to get louder or closer to her house. The witness went to the front bedroom. The witness saw a white convertible with black top with its headlights on and a man standing in front of the car and then saw what she now knew was a body. The witness told her father to go outside and then she went out. The body was a little west of her house. An ambulance came and a white convertible with a dark top pulled up on the north side of the street and a man got out. The car was facing east. The man asked the crowd if anyone saw the accident. The witness could not identify the driver. The victim was put in the ambulance and the ambulance drove off. The man got back in the white car and followed the ambulance. The white car went west towards Austin. The witness identified the car from photographs.

On cross-examination the witness testified that the first time she heard the screams was shortly after 11 P.M. A minute or two later, she heard another scream and went to the front bedroom. The witness saw a body in the street and a gentleman standing in front of the car. The car was east of the body. When the witness got to the street, the car and the gentleman were gone. Not more than a minute elapsed after the ambu-

lance arrived before the white car with a black top arrived on the scene facing east. The car followed the ambulance west. The car turned around but the witness could not recall how the turn was accomplished.

Maureen Deasey Addison testified that, on 18 November 1968, the witness resided at 5927 West Huron. At about 11:30 the witness and her sister were talking when they heard screams. They paid no attention to the screams because they subsided. A minute to a minute and a half later, the screams started again, only louder. She looked out the window and saw beams from a car's headlights and what appeared to be two people standing in the street. The witness could not tell whether the people were men or women because all she could see were their legs.

The witness' sister had gone to the front bedroom window which faces north. At this time, the witness was in bed. The sister explained that something had happened on the street and the witness got out of bed. The witness went downstairs to the front porch and saw a person lying in the street. Her sister called an ambulance which arrived in a few minutes. A white compact convertible came from Austin and parked on the north side of the street. The witness could not identify the young man who got out of the car. The young man went to the girl who was on the stretcher and then went to the crowd and said: "Nobody saw it, did they?" When the ambulance left, the white car turned around on the street and followed to the west towards Austin.

On cross-examination, the witness testified that she was on the street when the white car pulled up from the west. The white car came from Austin at such a speed that the witness did not think it was going to stop. Nobody answered the driver when he asked whether anybody had seen the accident.

Alyce Dity, the former wife of defendant, identified the defendant's car. The witness then testified that, on 14 November 1968, the witness and the defendant entered into a transaction whereby the witness signed over the title to the identified Pontiac car to the defendant, and the witness took over the title to and the payments on defendant's former car, a 1965 Grand Prix. There was about $1500 owing on the Grand Prix. The defendant told the witness he was in debt and that he had several bills to pay. He also stated he couldn't keep up the payments on the car and he would either have to come up with a buyer or the lender-bank would repossess the car. While the witness and defendant were in the Tempest on the 14th, after they had left the bank, defendant received a citation for speeding.

Frank Konieczka testified that he is a group supervisor for the Travelers Insurance Company. The witness was shown People's Exhibit 3 and recognized it as a life policy issued by his company. Defense counsel

objected and moved for a mistrial. The motion for mistrial was denied, but the court then prohibited the witness from testifying as to the existence of the policy or as to the name of the beneficiary. The jury was then immediately instructed entirely to disregard the testimony of Frank Konieczka.

Arthur Lawrence, a doctor on the staff of West Suburban Hospital, described the victim's wounds, and stated that she had a black mark across her chest which appeared to be a track. The victim had B positive blood. The witness' opinion as to the cause of death was a severe brain injury caused by a tremendous trauma caused by a blunt instrument.

James Mockler testified that he owned a 1967 maroon Bel Aire Chevrolet parked facing west in front of 5930 West Huron. At about 4 A.M. on the 19th of November, the police called his attention to a red substance on the front left bumper which appeared to be blood.

Sergeant Robert J. Doherty, a Chicago Police Officer, testified that he arrived on the scene at about a little after midnight. The witness noted a pool of blood at approximately 5930 West Huron. The witness proceeded to the emergency room at West Suburban Hospital, where he saw the defendant. He obtained the victim's clothing and had a conversation with the defendant who was not then a suspect.

The witness asked the defendant if he knew the victim so that he (the witness) could make a complete police report. Defendant thereupon made a statement to him. Defendant stated that he and his fiancee, the victim, had gone shopping. They had returned to her apartment at 5903 West Huron and had had an argument relative to a traffic ticket that his wife had received, but which ticket was in his possession. So as to prevent any further argument, defendant then stated that he was going to leave the apartment. As he went down to his car, she came running out of the apartment yelling to him. Defendant stated he pulled from the curb, went westbound to Austin, and then around the block so as to return to his fiancee to see if he couldn't clarify the argument. Upon his return, he said he pulled back alongside the curb in front of 5901 West Huron and he saw an elderly gentleman down in the middle of the block and an object or body in the middle of the street. He thereupon pulled out from the curb and went down to where this object lay in the street and found it to be his fiancee. He got back in his car and went to West Suburban Hospital, and notified the personnel there of the accident.

After the foregoing conversation with the defendant, the witness returned to the scene where he took various photographs and measurements of the blood stains on the street.

The witness then returned to the hospital where he met an Officer Healy. They and other officers went to the rear of the white Pontiac

convertible, parked in front of the hospital. The officers visually inspected the vehicle's undercarriage. The witness observed a brownish stain in the right rear tire well. In addition the transmission housing was devoid of grease on the underside of the housing. The other portions of the housing had grease on them.

The witness returned to the scene of the accident and other officers conducted a canvass of the area. The witness drove around the block at a speed of 30 miles per hour. The time it took to drive around the block was 74 seconds.

On cross-examination, the witness testified that the pool of blood was 13 feet from the north curb. The street is 33 feet wide. The witness also testified that the defendant was cooperative at the hospital.

Garryl Bare, a Mobile Unit Technician, testified that he examined the defendant's car during the early morning hours of 19 November 1968, after having received the victim's clothing from Officer Doherty. He identified the following People's Exhibits:

> # 18—Stain of a reddish substance taken from the right rear fender well.
> # 19—Fiber-like strand from left rear frame area near left rear wheel.
> # 20—Grease from side of transmission housing.
> # 21—Paint scrapings from rear area of auto.
> # 22—Red stain from front left bumper of 1967 Chevrolet, examined in the 5900 block of West Huron.

Rudolph Anders, a Mobile Unit Technician, testified that he examined the defendant's car on 23 November 1968. He identified the following People's Exhibits:

> # 23—Fiber from the front undercarriage of the vehicle.
> # 24—Sample of undercoating from the right rear wheel housing.
> # 25—Paint scrapings from right rear fender.

Timothy Zamb, Micro-analyst for the Chicago Police Department, testified that he had examined People's Exhibits 18 through 25. The witness also identified the following exhibits:

> # 26—Vacuum residue from blouse and brassiere.
> # 27—Vacuum residue from slacks, panties and pantyhose.
> # 28—Vacuum residue from bottom garments obtained by way of "flotation" method (presumably garments specified in Exhibit 27).

The witness testified to the following conclusions:

> (1) Exhibits 18, 22, and the victim's slacks all have stains of human blood, group A-B, on them.
> (2) Exhibit 20, contains a greaselike substance which when ex-

amined was similar as to microscopic properties and soluble characteristics when compared to the grease on victim's slacks.

(3) Exhibit 25, paint flakes had human blood on them.

(4) Paint flake from Exhibit 27 similar to flakes present in Exhibit 21 in respect to pigment and pigment distribution.

(5) Exhibits 19 and 23 are light brown human hairs which are morphologically similar. These hairs are similar to the hair found in Exhibit 26.

(6) Reddish-orange fiber found using microscope in Exhibit 24 is identical in type of fiber and coloration of fiber to the fiber in the slacks.

(7) Comparison of Exhibits 21 and 25 with vacuum residue of clothes revealed that the paint particles were microscopically similar with respect to pigment and pigment distribution.

On cross-examination the witness testified that the paint is a common type and is used by the majority of automobile manufacturers. The hairs found in Exhibit 26 are not similar to those found in Exhibit 28.

On redirect, the witness testified that Exhibits 19 and 23 contain head hair similar to human hair in Exhibit 26. Body hairs are not similar to head hairs.

Officer Healy testified to the taking of the defendant's written statement. Defendant had been placed under arrest at about 3 a.m. The statement was taken about 6:30 a.m. The only rights he informed defendant of were those recited in the statement. The statement was read into evidence. It was in large part exculpatory.

Frank Kannapes testified, on behalf of the defendant, that he resided at 5920 West Huron on the date in question. The witness was sitting on a chair when he heard a lady's voice. He looked out the window but couldn't see anything. About five or six minutes later, the witness looked out into the street and saw something moving. The witness ran to the street and saw a girl lying there. He asked her what happened and the girl responded that she fell. Then a car came from nowhere. The witness jumped aside and the car ran over the girl. The girl was dragged about 25 feet under the car. In the next five or six seconds, another car came around. The driver of the second car was the defendant. The defendant stopped about five feet away from the person. Defendant ran out of the car and he went to her and called her name. The girl responded by saying "Michael, Michael." Defendant got back in the car again and drove around the body and drove away. There was plenty of blood in the street. The defendant came back and parked on the north side of the street. Defendant's car was a light car. When defendant drove by the

blood, he never got closer than two or two and a half feet to the blood.

On cross-examination, the witness testified that he was 65 years old and wore glasses for reading. The witness recalled seeing a car parked facing west on the southwest corner of Mayfield and Huron with its headlights on. The witness could not recall the color of the car. Prior to the body being dragged there was no blood on the street around the body.

On redirect, the witness testified that the car that had been parked at the corner was the defendant's car.

Michael Parra, the defendant, testified in his own behalf that he had known Sharon Dobosz for about eight months prior to the accident. On 18 November 1968, he owned a 1962 Pontiac Tempest convertible, having acquired it four days prior to the above date.

Defendant saw the victim at about 11:05 p.m. on 18 November 1968 in front of his mother's house. He got into his car which she had been driving and went to a grocery store. From there they went to her apartment. At first he was not going to go up to her apartment because he was angry with her for being late to pick him up. Defendant, however, did go up to the apartment and was there for about five or eight minutes. He then left to go down to his car which was parked in front of 5901 West Huron, facing west, and on the south side of the street. Defendant proceeded toward Austin, went around the block, and parked the car in front of her apartment at about the same spot he had been parked before. Defendant then noticed a man in the middle of the street. The man was now known to him to be Mr. Kannapes.

Defendant pulled from the curb and drove to where the man was and noticed a body in the street. Defendant pulled to the side of the body, stopped the car, and recognized the body as that of Sharon Dobosz. She called "Michael, Michael" and defendant reached down and tried to pick her up. She told defendant that a car hit her or a car had run over her. Mr. Kannapes was present at this time.

Defendant got back into his car and drove to West Suburban Hospital. He told a guard sitting at the desk that a girl had been hit on Huron Street between Mayfield and Austin. Defendant then returned to where Sharon's body was.

There were people at the scene as well as a fire ambulance. Defendant asked a group of girls if they had seen what happened. After Sharon was put into the ambulance, defendant got into his car and went back to West Suburban Hospital.

Defendant went to the Emergency Room and talked to an Officer Shimkas. The officer asked defendant what happened. Defendant vaguely told him, and the officer asked to go look at his car. There was

another officer with him. The officers and defendant looked at the car and they all returned to the waiting room. Defendant talked with other officers. Officer Healy asked where the car was and told him they were going to take it to the auto pound and asked defendant for the keys. Defendant gave Officer Healy the keys. Defendant and the other officers drove to the "scene of the crime" in a police car.

After staying at the scene of the incident, they all went to the auto pound. Defendant's car was on a hoist. Officer Healy called defendant to look at some brown spots on the wheel and in the wheel housing. Defendant told Healy, "I told you at the hospital that I run through the blood, that I might have run through the blood following the ambulance."

The officers and defendant then went to defendant's ex-wife's house and then to the brother-in-law's house and back to the hospital. At the hospital, Officer Healy stayed in the car with defendant. Defendant thought that he was under arrest. Then they went back to the scene of the crime and then to the police station, where a written statement was taken from him.

Defendant neither murdered Sharon Dobosz nor ran over her with his car.

On cross-examination, the defendant testified that on 18 November 1968 he had an argument with Sharon Dobosz regarding his ex-wife. He was at her apartment for about five to ten minutes. It wasn't a yelling or screaming argument. Neither one of them was yelling. Sharon was not yelling, "I don't have my keys," or "I don't have any keys."

After defendant got to his car and turned on his ignition, Sharon yelled from her window asking him where he was going. She did not yell, "I don't have any keys." Defendant told her he would put the parking ticket in her mailbox. She left the window. Defendant got back in his car and pulled away. He was five or six car lengths away when he saw her coming out of the apartment. That was the last he saw her until he saw her in the street.

Defendant did not have his car window open and did not hear anyone yell after he had closed his car door. Defendant was trying to get out of there pretty fast. Defendant did not stop his car down the block to talk to anybody. Defendant came back around the block because he knew Sharon was outside and hysterical. He knew that she would be mad because he didn't come back to the apartment.

Defendant never ran over her nor did he feel any bump while he was driving the car. He was going fast so that she wouldn't catch up with him.

When defendant came back to the scene after having been to the

hospital, the ambulance was there, headed west. When the ambulance left, it went west, defendant went east. This is when defendant believed that he got blood on his ear.

Defendant did not have Sharon's keys. He gave Mr. Dobosz a set of keys to her apartment which were his set. Sharon's keycase did not look familiar to him, although he may have seen Sharon with it. Defendant did not think that he gave the keycase to Mr. Dobosz at the hospital.

Three witnesses then testified to the good reputation of defendant: one as to defendant's reputation for truth and veracity, and two as to defendant's reputation for being a law-abiding and peaceful citizen.

On redirect defendant testified that he did not know whether or not he got blood on his car the first time he noticed Sharon's body in the street. Defendant remembered giving Mr. Dobosz a set of keys at the hospital.

The eight issues raised on this appeal are as follows:

(1) Whether the trial court erred in failing to grant a mistrial after each mention of a life insurance policy, and in admitting testimony relating to defendant's financial condition.

(2) Whether the trial judge's comment in response to the State's objection to defense counsel's comment on Harrington's testimony about the color of the car hitting the decedent denied the defendant a fair trial.

(3) Whether the court erred in denying defendant's pretrial motion to suppress defendant's written statement, taken while he was in custody and without compliance with the full *Miranda* warnings, and whether, for the same reason, the trial court erred in admitting the statement into evidence.

(4) Whether the court erred in failing to grant defendant's pretrial motion to suppress physical evidence.

(5) Whether the court improperly permitted testimony to be given relative to defendant's speeding citation.

(6) Whether the statute under which defendant was convicted was unconstitutional.

(7) Whether the evidence was sufficient to sustain the conviction of the defendant for reckless homicide.

(8) Whether the court erred in denying defendant's application for probation, and whether the sentence was excessive.

OPINION

We deal first with the contention that the evidence adduced by the

State is not legally sufficient to support beyond a reasonable doubt defendant's conviction of the offense of reckless homicide.

Count III of the indictment charged defendant with the offense of involuntary manslaughter in violation of section 9—3(a) of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, par. 9—3(a)). Defendant was convicted of the included offense of reckless homicide under section 9—3(b). Those paragraphs read as follows:

"9—3(a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly.

(b) If the acts which caused the death consist of the driving of a motor vehicle, the person may be prosecuted for reckless homicide or if he is prosecuted for involuntary manslaughter, he may be found guilty of the included offense of reckless homicide."

Specifically, defendant contends that the State's evidence did not establish beyond a reasonable doubt that defendant's car ran over Sharon Dobosz, and that State's evidence failed to show any reckless conduct on the part of defendant. Hence, defendant is focusing on the evidence relative to defendant's causing the death of Sharon and on the evidence relative to the recklessness of defendant's acts in operating his automobile.

Section 4—6 of the Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 4—6) is a definition of recklessness. In pertinent part it reads as follows:

"4—6. A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. * * *"

By way of contrast, section 4—7, defines negligences as follows:

"4—7. A person is negligent, or acts negligently, when he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, described by the statute defining the offense; and such failure constitutes a substantial deviation from the standard of care which a reasonable person would exercise in the situation."

Comparing the two definitions, recklessness consists of a "conscious disregard" of a substantial and unjustifiable risk, which disregard is a "gross deviation" from reasonable care; criminal negligence is a failure to be aware of a substantial and unjustifiable risk of which a

reasonable person would have been aware, which failure is a "substantial deviation" from reasonable care. In order for the disregard to be conscious, it is clear that the person who disregards the risk must first be aware of it. Hence, in the instant case, the evidence for the State must prove beyond a reasonable doubt that defendant was aware of the risk that, under the circumstances which he knew then to exist, his conduct in operating his car was likely to cause death or great bodily harm to Sharon Dobosz, and that his conscious disregard of that risk was a gross deviation from the care a reasonable person would have exercised under the same circumstances. The jury found that these essential elements of reckless homicide existed beyond a reasonable doubt; we consider whether the State's evidence is legally sufficient to support that finding.

As a threshold matter, we think the jury could have found from the evidence that the car which struck Sharon as she was lying in the street was not the defendant's car. When defendant's car was seen for the second time, a very short while after it had departed for the first time going west in the 5900 block of West Huron Street and turning right onto Austin Boulevard (the first intersection to the west), it was observed to make a right turn onto West Huron Street from Mayfield Avenue (the intersection at the east end of the 5900 block of West Huron Street). It was, therefore, going south on Mayfield, and made a right turn to head west onto the 5900 block of West Huron. It was observed to pull briefly to a stop along the south curb near the intersection, and then to proceed west on Huron to within a few feet of the body of Sharon Dobosz which was then lying in Huron Street approximately in front of 5938 West Huron about 13 feet from the north curb of the 33-foot wide street, with other cars parked along both north and south curbs. Defendant's car stopped a few feet short of the body; defendant got out of his car, advanced on foot to the body, stayed very briefly, returned to his car, drove west passing around and to the south of the body, and again turned right onto Austin Boulevard. The car which hit and spun the body of Sharon as she was lying in the street had done so in the very short interval of time between the first departure of defendant's car and the second appearance of his car.

But, even assuming that the jury so found, we also think that there was evidence for the State from which the jury could have found beyond a reasonable doubt that defendant's conduct in operating his car during his first departure from the 5900 block of West Huron Street was reckless and was the legal cause of Sharon's death. On the above assumption, we will now consider the essential factors of recklessness and legal causation.

When Sharon's body was struck during that very brief interval of time by a car traveling west in the 5900 block of West Huron at about 11:30 p.m. on the night of 18 November 1968 at the rate of 30 to 35 miles per hour between cars parked on both sides of this 33-foot wide street, Sharon's body was then already lying in the street. No witness saw how Sharon's body came to be then lying in the street. More specifically, no witness could testify directly to having seen that the operation of defendant's car when it first departed to the west along the 5900 block of West Huron had been the cause of the circumstance that Sharon's body, on the appearance of the car which was seen to hit, spin, and drag her, was then already lying in the street.

It follows that the State's case is circumstantial. Under the assumption upon which we are considering the case, the State's theory of the case must be that defendant's operation of his car, in his first departure along the 5900 block of West Huron, caused Sharon to be left lying in the street; that defendant was aware of the risk of great bodily harm to Sharon under the attendant circumstances of time and place; that defendant consciously disregarded that risk by departing from the scene; and that such disregard was a gross deviation from the standard of reasonable care. We are mindful that, when the State's case in a criminal prosecution is based solely on circumstantial evidence, then, in order to prove its case beyond a reasonable doubt, the circumstantial evidence must exclude every reasonable hypothesis of innocence based on that same evidence. *People v. Dougard* (1959), 16 Ill.2d 603, 158 N.E.2d 596.

What is the evidence that the operation of defendant's car, in its first departure along the 5900 block from West Huron, caused Sharon to be left lying in the street? The best such evidence for the State is the physical evidence adduced by the State's technicians and the conclusions drawn therefrom by Micro-analyst Zamb, when viewed against the background supplied by the testimony of Teresa Terrana. We now summarize that physical evidence, which of course is a species of circumstantial evidence, accurate conclusions or inferences from which have substantial probative value. There are five items of physical evidence: blood stains; paint particles and paint flakes; grease; slacks fibers; and hairs.

(1) A blood stain of the same blood type as that of the victim (type A-B, which type of blood is possessed by about 3% of the population) was found on the right rear fender well of defendant's car (People's Exhibit 18). In addition, paint scrapings taken from the right rear fender of defendant's car had human blood on them (People's Exhibit 25). Defendant explains that, from the very first discovery of reddish-brown

stains on the rear area of his car by police officers on the night of the incident, he consistently told the police that he must have, and thought he had, driven his car (which was then parked on the north side of West Huron facing east) through the victim's blood which was on the street, as he drove east in the process of following the ambulance to the hospital. On the other hand, at the trial, three State witnesses (Terrana, Shannon, and Addison) testified that defendant followed the ambulance by driving west on Huron Street behind it. All three agreed that his car had then been parked on the north side of Huron facing east, which would require that the car be turned around on Huron Street. Two of the three witnesses did not know how the car had been turned around, but the third witness testified that defendant had turned his car around by pulling into a driveway which was located short of the place where the victim had been lying in the street, and then by backing out so as to head west.

(2) Paint scrapings taken from the rear area of defendant's car (People's Exhibit 21) and a paint flake found in the vacuum residue from the slacks, panties, and panty-hose worn by the victim (People's Exhibit 27) where similar in respect of pigment and pigment distribution. Also similar in those two respects were paint particles in paint scrapings taken from the right rear fender and the rear area of defendant's car (People's Exhibits 25 and 21 respectively) and paint particles found in the vacuum residue of the articles of clothing worn by the victim (People's Exhibits 26, 27 and 28), when the respective paint particles were microscopically compared. The type of paint was the type used by the majority of automobile manufacturers.

(3) A grease specimen taken from the side of the transmission housing of defendant's car (People's Exhibit 20) was similar in microscopic properties of size and solubility characteristics to grease found on the slacks of the victim, but Microanalyst Zamb could not say that the greases were the same.

(4) A very minute reddish-orange fiber fragment, found in a microscopic examination of a sample of undercoating taken from the right rear wheel housing of defendant's car (People's Exhibit 24), was identical in type and color to the fiber in the slacks worn by the victim.

(5) A light brown human hair taken from the inner side of the left rear frame area of defendant's car near the left rear

wheel (People's Exhibit 19), and a light brown human hair taken from the front undercarriage of defendant's car (People's Exhibit 33) were morphologically similar (i.e., similar in form or structure); both hairs were similar to hair found in the vacuum residue from the blouse and brassiere worn by the victim (People's Exhibit 26).

From this physical evidence and the conclusions drawn from it by Micro-analyst Zamb, the jury could infer beyond a reasonable doubt that defendant's car, in its first departure to the west along the 5900 block of West Huron, had passed over Sharon's body, thereby causing her to be left lying in the street. Defendant's attempt to dissipate that inference related to one only of the five items of physical evidence (i.e., the blood stain), and his explanation conflicted in essential details with the testimony of three witnesses for the State, so that the jury might have found from the evidence that his explanation was not credible. Absent a credible explanation, the jury's inference is supported by the State's evidence. (See *People v. Whitley* (1974), 18 Ill.App.3d 995, 999, 311 N.E.2d 282.) Nor is Frank Kannapes' testimony that, in response to his question as to what happened, Sharon said she fell, necessarily at odds with the inference that defendant's car passed over Sharon, because her statement does not relate to the cause of her fall.

The inference that defendant's car passed over Sharon's body is strengthened by the testimony of Teresa Terrana. Her testimony placed Sharon alongside the car at the passenger door, crying and talking to defendant for two or three minutes, with both speaking in loud voices. Then the witness heard a thud like a car door closing, and she saw the car go west toward Austin Boulevard. In addition, defendant's own testimony at trial was that, when he first pulled away from in front of Sharon's apartment heading west on Huron, they had just quarreled and he was angry at her.

■■ From all the circumstantial evidence marshalled above, could the jury infer beyond a reasonable doubt: (1) that defendant was aware of the substantial and unjustifiable risk that his conduct in so operating his car was, either in itself or in conjunction with other reasonably foreseeable direct and consequential causes, likely to cause death or great bodily harm to Sharon; (2) that defendant consciously disregarded that risk; and (3) that such disregard constituted a gross deviation from the standard of care which a reasonable person would exercise under the same circumstances? We think it could. The testimony of Teresa Terrana was that defendant knew that Sharon was standing in the street alongside the passenger door of his car at the time he accelerated the car from a standstill with sufficient force to cause a thud like a car

door closing. We have already concluded that the jury could infer beyond a reasonable doubt that defendant's car passed over Sharon's body. From the testimony of Sergeant Doherty that the underside of the transmission housing of defendant's car was devoid of grease while the other portions of housing had grease on them, and from the testimony of Micro-analyst Zamb that grease on Sharon's slacks was similar in microscopic properties of size and solubility characteristics to grease taken from the side of the transmission housing of defendant's car, the jury could infer that, in passing over, there had been contact between the transmission housing and Sharon's slacks. Despite defendant's testimony that he did not feel any bump, the jury could further infer that he had been aware of that contact and, under the attendant circumstances, aware of the substantial risk that the contact was related to Sharon and of the further risk that Sharon had been incapacitated by the contact. Despite such awareness, defendant did not immediately stop to investigate as a reasonable person would have done, but proceeded on, which conduct constituted a conscious disregard of the substantial risk and also constituted a gross deviation from the standard of care which a reasonable person would exercise under the same circumstances. We conclude that the jury could infer beyond a reasonable doubt from the evidence marshalled above that defendant's conduct in accelerating his car and in failing to stop his car in order to investigate the cause of the contact was, under all the attendant circumstances, reckless conduct.

Thus far, we have concluded that, from the evidence, the jury could infer beyond a reasonable doubt that defendant's reckless conduct in operating his car, left Sharon lying in the street in the 5900 block of West Huron at 11:30 p.m. on a November night. The street was 33 feet wide from curb to curb; cars were parked on both sides of the street. John Harrington testified that, before he had seen Sharon spun around by a car (and, according to Sergeant Doherty, left lying 13 feet from the north curb), she had been lying in the middle of the street; she had been hit by the car about one minute after he had seen her lying in the middle of the street with an elderly man bending over her. Frank Kannapes testified that he was the elderly man and that, almost immediately after he had reached Sharon as she was lying in the street, a car came from nowhere, ran over Sharon, and dragged her under the car for about 25 feet.

We have already concluded that the jury could have found from the evidence that the car referred to was not defendant's car but a second car, and we are considering the cause on the assumption that the jury did in fact so find. The issue then becomes whether defendant's

reckless conduct in causing Sharon to be lying in the middle of the street can be said to be the legal cause of Sharon's death or whether the second car constituted a supervening cause.

It is clear that the injuries inflicted by a defendant need not be either the sole or the immediate cause of death in order to constitute them the legal cause of death. (*People v. Reader* (1962), 26 Ill.2d 210, 186 N.E.2d 298.) In most of the involuntary manslaughter cases applying this principle, the reckless conduct of a defendant directly caused an injury to the victim which, while not in itself likely to cause his death, yet exposed the victim to the operation of a subsequent natural force which was the immediate cause of his death. For example, a defendant strikes a blow which stuns the victim so that the victim then falls and sustains a skull fracture as a result of the fall, and the skull fracture is the immediate cause of death. (*Cunningham v. People* (1902), 195 Ill. 550, 63 N.E. 517.) Again, hypothetically, a defendant might strike a blow which renders the victim unconscious and the victim is thereby exposed to sub-zero cold and freezes to death. In *People v. Meyers* (1946), 392 Ill. 355, 360, 64 N.E.2d 531, our Supreme Court, quoting from *Cunningham,* formulated the general principle applicable to such cases as follows:

"If death results indirectly from a blow through a chain of natural causes, unchanged by human action, the blow is regarded as the cause of death."

Thus formulated, the principle may appear restricted to cases in which the immediate cause of death is a natural cause or a chain of natural causes unchanged by human action, whereas, in the instant case, the immediate cause of death is the human action of a person other than the defendant. We do not believe, however, that our Supreme Court in *Meyers* intended thereby to exclude, from the scope of cases in which the immediate cause of death is a cause which is a direct consequence of the initial causal act of a defendant, every case in which the direct consequential cause is the *human* causal act of another. Our Supreme Court was dealing with cases in which the immediate cause was a natural cause. We think the legal significance of the natural consequential cause is that it is reasonably foreseeable as such to a defendant. Where, therefore, the immediate cause of death is the human act of another which is a direct consequence of the defendant's initial reckless conduct and is reasonably foreseeable to the defendant, the general principle remains applicable.

■■ We have not found an Illinois case so holding, but we are persuaded by a Georgia Appellate decision which so held. *Wyrick v. State*

(1958), 96 Ga. App. 847, 102 S.E.2d 53. The Georgia Court began with the "natural cause" principle, which it expressed as follows:

"Where one commits a battery upon another, or inflicts a wound upon such other, which battery or wound is not likely in itself to produce death, but which renders the other person more susceptible to disease, or leaves him at the mercy of the elements or some other intervening agency, which other intervening agency brings about his death, the original wounding or battery of the deceased is in a legal sense the cause of death." (96 Ga. App. 847, 847, 102 S.E.2d 53, 54.)

The court then applied this principle to convict the defendant of involuntary manslaughter on the following facts: Without provocation in a fight, the defendant battered the victim with his fists. In an effort to escape from the defendant, the victim ran between parked cars into the street in the path of a truck which struck and killed him.

■■ In the instant case, we have concluded that, from the evidence for the State, the jury could infer beyond a reasonable doubt that defendant recklessly operated his car so that it passed over Sharon's body and left her lying in the middle of a 33-foot wide street with cars parked along both curbs at 11:30 p.m. on a November night. As a direct consequence of her prone position in the middle of the street, she was struck and killed by a second car which was traveling down the street at a speed estimated at 30 to 35 miles per hour. We think this immediate cause of her death was, under the circumstances, reasonably foreseeable by defendant. We conclude that defendant's reckless conduct was the legal cause of Sharon's death.

The next contentions of defendant on this appeal arise from the State's effort to prove a financial motive for the killing of Sharon Dobosz in support of the two murder counts. Defendant's former wife testified that, shortly before the death of Sharon, she and defendant exchanged cars; she conveyed title to her car to him in return for receiving title to his newer car and for assuming his liability for the balance of the outstanding installment payments on his car in the amount of $1500. The reason for the exchange, according to her, was that defendant was financially unable to meet the installment payments and had other outstanding debts as well.

In *People v. Dorr* (1931), 346 Ill. 295, 178 N.E. 476, the court stated that a defendant's mere lack of money, without other incriminating circumstances, will not support the inference that he will commit a crime of violence in order to improve his financial condition; hence, absent other incriminating circumstances, it was error in that case to admit

testimony as to defendant's financial needs, but the error was not so prejudicial as to warrant reversal.

■■ In the instant case, the trial court thought there was some relevance in establishing defendant's ownership of the car which he was operating at the time of the incident. We can see no relevance in that respect and we think it was error to admit the testimony of his former wife over defense objection. But the fact that the error was not prejudicial is clear from the fact that the jury found defendant guilty, not of murder, but of reckless homicide.

The matter of Sharon's life insurance policy (People's Exhibit 3) is also related to a financial motive. There were two references to the policy. In the first reference, Sharon's father disclosed to the jury that the document which was People's Exhibit 3 was a life insurance policy which the witness had found in Sharon's apartment after her death and burial. Defense counsel immediately moved for a mistrial; the motion was denied, but the trial court immediately directed the jury to disregard the identification of Exhibit 3 as a life insurance policy, and no details of the policy were disclosed to the jury. We note also that the witness' identification of Exhibit 3 as a life insurance policy was volunteered by the witness and was not elicited in response to any question of the prosecutor.

■■ The existence of a life insurance policy on the life of the victim payable to a defendant is admissible to show motive only if it first be proved that the defendant knew of the existence of the policy and of his relationship to it. (*People v. Coleman* (1971), 49 Ill.2d 565, 276 N.E. 2d 721; *People v. Gougas* (1951), 410 Ill. 235, 102 N.E.2d 152.) When, for want of a sufficient basis, the trial court orders testimony as to a life insurance policy stricken and immediately directs the jury to disregard it, the error is cured and rendered harmless in the absence of some indication that the jury did not or could not in fact disregard it. (Compare *People v. Dukett* (1974), 56 Ill.2d 432, 308 N.E.2d 590, with *People v. Hal* (1962), 25 Ill.2d 577, 185 N.E.2d 680.) There was no such indication here, and the principle applies *a fortiori* to volunteered testimony as to a life insurance policy.

The second reference represented the State's real effort to introduce testimony as to the existence of a valid group life insurance policy on the life of Sharon, payable to defendant in the face amount of $4,000. This effort was made when the State called one Frank Konieczka as its witness. As soon as the witness identified People's Exhibit 3 as a group life insurance policy issued by the insurer for which he was a group life supervisor, defense counsel moved for a mistrial owing to the lack of a sufficient basis for the testimony. In a conference out of the

presence of the jury, the trial court found that the State could offer no sufficient basis for the testimony, so that the court would not permit the witness to offer any further testimony as to the policy. Thereupon, the trial court denied the motion for a mistrial, but immediately directed the jury to disregard the testimony of the witness in its entirety. Under the principle stated above, this action of the trial court cured the error and rendered it harmless, and there was no indication that the jury did not in fact disregard the testimony.

██ In the course of her testimony, defendant's former wife was permitted to testify, over objection, that defendant had received a speeding citation, four days before the homicide. On this appeal, defendant contends that this testimony was prejudicial in that it tended to establish that defendant had a propensity for speeding such that he may have well been speeding on the night of the homicide. Parenthetically, we note that one of the difficulties in this appeal is that the State refused to take a position as to whether the car which passed over, spun, and dragged Sharon as she lay in the middle of the street was or was not defendant's car. That car was proceeding at an estimated speed of 30 to 35 miles per hour, which would be over the maximum speed limit for ordinary residential streets in Chicago. Since we have concluded that the jury could have found from the evidence that that car was not defendant's car and since we are considering the case on the assumption that it did so find, the speed of that car is unrelated to defendant's operation of his car. Nor is speeding the same thing as "jack rabbit" acceleration from a standstill. It was not excessive speed which caused this tragedy, but rather Sharon's prone position in the middle of the street shortly before midnight. In any event, at the close of the State's case-in-chief (which, as defendant points out, occurred two days and 350 transcript pages of testimony after the speeding citation testimony of defendant's former wife), the trial court directed the jury to disregard this portion of the former wife's testimony. Under all the circumstances, we think the said testimony, even if its admission was error owing principally to its irrelevance, was not prejudicial error which contributed to defendant's conviction, and there was, of course, no indication that the jury did not in fact disregard the testimony.

The next contention on this appeal relates to an alleged prejudicial comment as to the evidence, made by the trial court when, during the course of defense counsel's closing argument, the State interposed an objection. The background for this contention is that, at trial, John Harrington, testifying as a witness for the State, was asked on cross-examination by defense counsel, whether the car which he saw pass over and spin Sharon was entirely light colored. Harrington replied: "That's

the impression I got. A cream or light colored car." This testimony was important because defendant's car had been described as white with a dark top. During the closing argument, defense counsel stated: "I asked him [Harrington] whether it was all one color or black and white, and he said it was all one color, light or cream color." The State objected, questioning the accuracy of counsel's paraphrase of Harrington's testimony. The trial court sustained the objection, saying: "The jury will recall. I could not recall that. I remember his testifying that it was a light or cream colored car. I don't recall any testimony about it being all one color." Defense counsel did not then object to the court's comment and did not thereafter dwell on the discrepancy between the color of defendant's car and Harrington's testimony as to the color of the car which he saw. Among the instructions later given to the jury was the standard instruction that, by any ruling or remarks which the trial judge had made during the course of the trial, he did not mean thereby to indicate any opinion as to the facts of the case.

■■ The thrust of the instant contention is that the trial judge's comment and his sustaining of the State's objection tended to create in the minds of the jurors doubt as to the existence of certain important testimony which did in fact exist. We think the trial court erred in making its ruling and comment, but we do not think the error was shown to be prejudicial. The principal reason is that, as we have already indicated, we think the jury could have found from all the evidence that the car which Harrington saw was not defendant's car, but that, despite such a finding, the jury could also have found from all the evidence beyond a reasonable doubt that defendant's car had passed over Sharon so that she was left lying in the street to be hit by the car which Harrington saw, a risk which was reasonably foreseeable by defendant. Hence, the ruling and comment cannot be shown necessarily to have had any prejudicial effect. There is no indication that the jury either did or did not convict defendant of reckless homicide because it found that the car which Harrington saw was defendant's car. In addition, the standard cautionary instruction (warning the jury not to infer any opinion on the part of the trial court as to the facts in the case from any ruling or remarks which the court had made during the course of the trial) would render the error harmless in the absence of any indication that the jury disregarded the instruction. We find that the error was not shown to be prejudicial.

The next contention of defendant on this appeal is that the court erred in denying defendant's pretrial motion to suppress a written statement of defendant, taken while he was in custody without compliance with the full *Miranda* warnings. At the hearing on the motion, Officer

Healy testified for the State that defendant had been placed under arrest at about 3 a.m. on 19 November 1968. Officer Healy had taken the statement from defendant about 6:30 a.m. on that day. Officer Healy stated that the only rights of which he had informed defendant were those recited in the written statement itself, namely, the right to remain silent and the right to counsel. Defendant, therefore, had not been informed that anything he said could and would be used against him, a required *Miranda* warning. Nevertheless, the court denied defendant's motion to suppress, and, at trial, the written statement was read into evidence over objection. On this appeal, defendant contends that it was reversible error to deny the motion to suppress and to admit the written statement into evidence.

■■ The error, however, is not grounds for reversal on constitutional grounds if it is harmless beyond a reasonable doubt in that it did not contribute to defendant's conviction. (*Chapman v. California* (1967), 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824; *People v. Landgham* (1970), 122 Ill.App.2d 9, 257 N.E.2d 484.) We do not think this statement did so contribute. The statement is almost entirely exculpatory. It does contain one or two potentially inculpatory details, but these details are merely cumulative to the State's evidence as to the same details, for which reason the statement can be found beyond a reasonable doubt not to have contributed to defendant's conviction. The details were that defendant conceded that he had been arguing with Sharon about a traffic ticket while they were in the car after she had picked him up and while they were in the apartment before he left and drove away, and that he was angry when he left.

The next contention of defendant on this appeal is that the denial of his pretrial motion to suppress certain physical evidence was reversible error. The basis for the motion was that the physical evidence had been obtained by an illegal search and seizure of his car, both at the hospital and then later at the police auto pound. At the hearing on the motion, defendant testified that, while he and several police officers were still at the hospital, Officer Healy asked him if he would show Healy and another police officer his car. Thereupon, defendant went with the officer and pointed out his car parked in front of the hospital. By the use of flashlights, the officers then made a visual inspection of the undercarriage of his car and noticed red stains which appeared to be blood stains. A little later, Officer Healy informed defendant that he (Healy) intended to take defendant's car to the police auto pound; he asked defendant for the car keys, and defendant gave them to Healy. The car was towed to the pound with the rear wheels of the car raised off the ground. Later, at the pound, scrapings and other specimens

which constituted the physical evidence sought to be suppressed were taken from the car by technicians.

■■ In *People v. McCracken* (1964), 30 Ill.2d 425, 429, 197 N.E.2d 35, 37, our Supreme Court stated that "* * * a search implies an invasion and quest with some sort of force, either actual or constructive." Where evidentiary items taken in a search are in "plain view" so that they may be seen by an observer without any invasion of, or prying into, a private place, there is no illegal search involved. (*People v. Bombacino* (1972), 51 Ill.2d 17, 280 N.E.2d 697.) Having made a "plain view" discovery of a stain on the underside of defendant's car which appeared to be a blood stain and against the background of the oral statement which defendant had already given to Sergeant Doherty, Officer Healy had probable cause to believe that defendant's car would yield evidence related to the death of Sharon, so as to justify his warrantless seizure and subsequent search of the car in order to prevent defendant from attempting to remove so mobile an object as the car and its evidence. (*People v. Dockery* (1971), 3 Ill.App.3d 38, 278 N.E. 2d 147; and see *People v. Joyner* (1972), 50 Ill.2d 302, 278 N.E.2d 756.) The removal of the car to the police auto pound was necessary in order to provide mechanical equipment and trained personnel; and the interval of time and space thereby involved does not alter the reasonableness of the search. (*People v. Ricketson* (1970), 129 Ill.App.2d 365, 264 N.E.2d 220; *People v. Jones* (1967), 38 Ill.2d 427, 231 N.E.2d 580.) In addition, it is clear that Officer Healy asked defendant for the car keys before defendant was arrested at about 3 a.m. on 19 November 1968. The fact that defendant gave the keys to Officer Healy would indicate his consent to the further search of his car at the police auto pound. We conclude that there was no error in the denial of defendant's pretrial motion to suppress certain physical evidence.

Defendant's next contention on appeal is that the statutory subsection under which he was convicted (namely, Ill. Rev. Stat. 1969, ch. 38, par. 9—3(b)) is unconstitutional. This contention was raised some two weeks prior to oral argument by way of a motion in this court for leave to file supplemental authority, which motion was allowed. Defendant's supplemental authority consisted of the decision of this court (Fourth District) in *People v. McCollough* (1972), 8 Ill.App.3d 963, 291 N.E.2d 505, in which the majority held that section 9—3(b) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—3(b)) (which was the same subsection as that involved in the instant case) violated the equal protection clauses of the Federal and 1970 State constitutions in that the paragraph "places within the uncontrolled and unguided discre-

tion of the State's Attorney, the Grand Jury, and in some instances the trial judge or petit jury, the power to impose different degrees of punishment for different persons who .commit identical acts under identical circumstances."[4]

■■ While the instant case was under advisement, our Supreme Court allowed the State's petition for appeal as a matter of right from the decision of this court in *People v. McCollough* (1972), 8 Ill.App.3d 963, 291 N.E.2d 505. Thereafter, our Supreme Court (two Justices dissenting) reversed this court and affirmed the trial court. (*People v. McCollough* (1974), 57 Ill.2d 440, 313 N.E.2d 462.) The majority held that section 9—3(b) did not deprive anyone of due process of law or of equal protection of the laws and was not unconstitutional. (Nor was McCollough's conviction reversible for the different reason relied on by the concurring Justice.) The Supreme Court of the United States then dismissed defendant's further appeal for want of a substantial Federal question. (*McCollough v. Illinois*, 419 U.S. 1043, 42 L.Ed.2d 637, 95 S.Ct. 614.)[5] Hence, the contention of defendant in the instant appeal as to the unconstitutionality of section 9—3(b) has no merit.

Defendant's final contention in this appeal is that defendant's sentence of from two to five years' imprisonment in the Illinois State Penitentiary, while within the statutory limits, was nevertheless excessive, and that the trial court erred in denying defendant's application for probation pursuant to the provisions of section 117—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1969, ch. 38, par. 117—1). Defendant asks that this court, pursuant to its powers under Supreme Court Rule 615(b)(4), reduce the sentence to probation for any period which to this court seems just. In support of this contention, defendant filed an additional abstract of record, being an abstract of the mitigation testimony at the hearing in aggravation and mitigation.

Neither Supreme Court Rule 615(b)(4) nor section 11 of article I of the 1970 Illinois Constitution authorizes a reviewing court to reduce a penitentiary sentence to probation. *People ex rel. Ward v. Moran* (1973), 54 Ill.2d 552, 301 N.E.2d 300.

■■ Probation has consistently been held to be a purely discretionary matter vested in the trial court. (*People ex rel. Ward v. Moran.*) In reviewing a contention that a trial court erred in denying a defendant's application for probation, the reviewing court is limited to determining

---

[4] The third Justice concurred in the result (*i.e.*, the reversal of the defendant's conviction) but for a different reason.

[5] We deferred consideration of this case until this issue of the constitutionality of section 9—3(b) had been finally adjudicated.

whether the denial was arbitrary and constituted an abuse of discretion. (*People v. Saiken* (1971), 49 Ill.2d 504, 275 N.E.2d 381.) In the instant case, we find no indication that the trial court acted arbitrarily or otherwise abused its discretion in denying defendant's application for probation. We hold that the trial court did not err in denying defendant's application.

At the hearing in aggravation and mitigation, the State introduced testimony that defendant had a record of convictions for numerous moving traffic violations, such as failing to stop at a stop sign, running red lights, making improper turns, and speeding. Owing to some of these convictions, defendant's driver's license had been suspended by the Illinois Secretary of State for two months in mid-1968. Taking the position that defendant's instant conviction of reckless homicide was the culmination of his numerous convictions for moving traffic violations, the State recommended imprisonment for from three to five years. In view of defendant's good army service record, the trial court then imposed the sentence of from two to five years.

■■ In *People v. Fox* (1971), 48 Ill.2d 239, 251-52, 269 N.E.2d 720, 728, our Supreme Court said that a sentence, within the statutory limits but nevertheless alleged to be excessive, should not be disturbed "* * * unless it is greatly at variance with the purpose and spirit of the law or manifestly in excess of the proscriptions * * * of the Illinois constitution which requires that all penalties should be proportioned to the nature of the offense. The trial court is normally in a superior position during the trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed than are courts of review." Accordingly, we cannot say that the instant sentence was excessive.

For the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

Mr. PRESIDING JUSTICE DOWNING specially concurring: [6]

I concur that the judgment of conviction should be affirmed. In my opinion I think there is, as a matter of law, sufficient evidence in the record to support the verdict of the jury. *Cf. People v. Ricketson* (2nd Dist. 1970), 129 Ill.App.2d 365, 379-80, 264 N.E.2d 220.

---

[6] At the time of the oral argument of this case, Justice Ulysses S. Schwartz sat with Justices Leighton and Hayes. Subsequently Justice Schwartz died. Since that time Justice Downing was designated the third member of the panel and has listened to the tape of the oral arguments and has read the briefs, abstract and record in this case.

The evidence as carefully and thoroughly set forth in this opinion by Justice Hayes, in my opinion, provides a sufficient basis upon which the jury could conclude that the conduct of the defendant in operating the automobile was reckless and that such recklessness caused the death of Sharon. The evidence presented by the State placed the defendant in the automobile on Huron Street, and placed the deceased in the street near and about the automobile. Under these circumstances that evidence, together with the strong, unrebutted scientific and technical evidence concerning the condition of the defendant's car, in my opinion, supports the jury's verdict of reckless homicide. It is to be noted that the defendant failed to contradict or impeach the strong scientific and technical evidence of the State.

In addition, the jury had before it the testimony of the defendant which was contradicted on a number of points. To mention a few conflicts for example: whether Sharon was in the street near the car, whether Sharon and the defendant had been arguing about her keys, and whether Sharon's key case, identified by the deceased's parents as having been given to them by the defendant at the hospital, was, in fact, so given them. It is for the jury to resolve conflicting testimony, to determine what weight to give to particular testimony, and to resolve the question of the credibility of witnesses. Here the jury was perfectly justified in completely rejecting the testimony of the defendant.

It should also be noted that with all the witnesses who observed various parts of the incident, not one witness clearly and definitely placed a second car on Huron Street at the time of the incident. State witness Harrington saw a light-colored intermediate car but did not know whether it was a hardtop or convertible. Defendant's witness Kannapes offered no descriptive testimony as to the car that hit the deceased in the street except that it was a heavy car. Thus the jury could have concluded that it was the defendant's car that caused the death of Sharon.

As said by our supreme court in *People v. Hairston* (1970), 46 Ill.2d 348, 365-66, 263 N.E.2d 840:

> "It is the province of the jury to determine the guilt or innocence of an accused and its verdict will not be set aside on review, unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to justify a reasonable doubt of guilt. (*People v. Nicholls*, 42 Ill.2d 91; *People v. Peto*, 38 Ill.2d 45.)"

In my opinion the verdict of the jury meets the aforesaid test.

Mr. JUSTICE LEIGHTON, dissenting:

My study of the record leads me to conclude that in this case the

State has taken the accidental death of an unfortunate young woman and turned it into a prosecution for murder and involuntary manslaughter. In the trial court, it was the State's theory that the defendant, Michael Parra, with his automobile, murdered Sharon Dobosz, his girlfriend, so he could collect the proceeds of insurance on her life. Twenty-one witnesses testified for the State in support of this theory. Much of their testimony was trivia concerning defendant's personal life, but all aimed at suggesting to the jury that he had a financial motive to commit the murder. The jury, however, did not accept the State's murder theory; it reached what to my mind was a compromise and convicted defendant of reckless homicide. In this court, and for the first time in the case, defendant is told that he did not kill Sharon Dobosz; he is told that in this court's view he recklessly caused her body to be in the middle of a Chicago street where some other automobile was the intermediate cause of her death.

I have carefully read the majority opinion of Mr. Justice Hayes; and because I respect him, I cannot suppress a feeling of admiration for what he has written. I regret to say, however, that I find his construction of the simple facts of this case strained and hypertechnical. There is no evidence in this record which proves, beyond a reasonable doubt, that defendant, in the operation of his automobile, recklessly caused Sharon Dobosz to be in the middle of the street where she was killed by someone else. It is well established that before a conviction for reckless homicide can be sustained, the proof must disclose beyond a reasonable doubt that in driving his automobile the defendant was guilty of wilful and wanton negligence. *People v. Crego*, 395 Ill. 451, 70 N.E.2d 578; *People v. Johnson*, 10 Ill.App.3d 778, 295 N.E.2d 291.

The majority opinion, after some speculation as to what the jury could have done, concludes it could have found that defendant's automobile did not kill Sharon Dobosz; but that he was, nonetheless, the cause of her death. To provide the legal basis for this conclusion, Justice Hayes' opinion relies on a number of cases, all of them instances in which the accused inflicted an intentional injury that was found to be casually connected with a death that followed. But Justice Hayes says that no Illinois case can be found which had held as would the majority in this case. But a Georgia appellate decision, *Wyrick v. State* (1958), 96 Ga.App. 847, 102 S.E.2d 53, according to Justice Hayes, is persuasive. *Wyrick*, it turns out, is like the Illinois cases cited by Mr. Justice Hayes; it, too, was a case where an intentional injury was found to have indirectly produced the death for which the accused was held responsible.

I do not believe it necessary to go to Georgia for authority to support

the proposition that one who intentionally inflicts an injury is responsible for the natural and probable consequences of his act. There are many Illinois cases which explicitly or by implication support the doctrine applied in *Wyrick*. (See *Belk v. People*, 125 Ill. 584, 17 N.E. 744; *People v. Smith*, 56 Ill.2d 328, 307 N.E.2d 353; *People v. Paulson*, 80 Ill.App.2d 44, 225 N.E.2d 424.) The trouble I have with the case before us is not with the availability of authorities to support the law to be applied (see Perkins on Criminal Law 685-738 (2d ed. 1969)); my trouble is with the lack of evidence to prove that reckless homicide was committed by the defendant.

Moreover, the majority opinion, after rejecting defendant's contention concerning the evidence, reviews five issues he raises concerning procedural rulings which he contends were erroneous. Each issue involved a matter which, in my judgment, had the capacity to affect the result reached by the jury in this case. As to four of these issues, Justice Hayes agrees with defendant that error was committed by the trial court; but he concludes that all were harmless.

I find it difficult to see how anyone can speculate about what the jury could have found from the evidence, guess at the State's theory of prosecution, and then be able to conclude that four procedural errors were all harmless. In my view of this case, even if it could be said that individually the four errors were harmless, collectively they were prejudicial. This was a case in which the defendant testified, denied the charges against him, and produced a witness whose testimony placed the evidence in sharp conflict. In an instance like this, it is required that the record be free from prejudicial error to avoid reversal of the conviction. (*People v. Jarvis*, 306 Ill. 611, 138 N.E. 102; *People v. Donaldson*, 24 Ill.2d 315, 181 N.E.2d 131.) This record is not free of prejudicial error. For the reasons given, I would reverse defendant's conviction without remand and terminate this prosecution. Therefore, I respectfully dissent.